**UNITED STATES of America,**

v.

**Bernarr ZOVLUCK et al., Defendants.**

**Nos. 67 Cr. 485, 67 Cr. 513, 67 Cr. 469.**

United States District Court
S. D. New York.

Aug. 21, 1967.

---

Robert M. Morgenthau, U. S. Atty., for Southern District of New York, by Richard A. Givens, Asst. U. S. Atty., New York City, for the United States of America.

Nicholas Atlas, Anthony H. Atlas, Atlas, Berg & Mendalis, New York City, for defendant.

MANSFIELD, District Judge.

The defendants have filed a flurry of motions in omnibus form directed toward two indictments handed down by the Grand Jury (67 Cr. 485 and 513) charging all defendants (in thirteen and five counts, respectively) with mail fraud, 18 U.S.C. § 1341, false use of the initials "U.S.", 18 U.S.C. § 712, and conspiracy to violate the mail fraud statute, 18 U.S.C. § 371. The Government has cross-moved for consolidation of the indictments and an early trial date.

More specifically the defendants have moved for (1) dismissal of the indictments on the ground that the Government improperly procured them by unfair conduct before the Grand Jury, and on the further ground that prejudicial publicity may have affected the Grand Jury and will preclude a fair trial; (2) an order pursuant to Rule 41(e), F.R. Crim.P., vacating search warrants used as the basis for seizure of property belonging to the defendants and directing the return of the items seized, and (3) an order pursuant to Rule 16(b), F.R. Crim.P., directing the Government to provide the defendants with an inventory of items seized and the return of certain records or copies thereof.

The core of the first indictment (67 Cr. 485), filed on May 15, 1967, is the charge that beginning in January, 1964, the defendants devised and engaged in carrying out a scheme to defraud members of the public into believing that they could obtain free chiropractic health and medical services, whereby the defendants lured unsuspecting patients to patronize their facilities and to sign papers or obtain services (e. g. x-rays) that were not free, following which the defendants would use a series of frightening methods, including threats and false statements, to force the victims to pay money. More specifically, it is alleged that the defendants falsely represented, through a systematic campaign of telephone calls, letters and advertisements, that their chiropractic center offered free help to patients, that it was government and trade-union sponsored and that it was part of medicare and medicaid; that the defendants caused unlicensed persons to pose as doctors and lawyers in the handling of patients induced to patronize the "free" services, defrauding such patients into believing they needed costly x-rays and expensive treatments and inducing them to sign

contracts for payment without realizing what they had done. It is further alleged that the defendants would attempt to force the "free" patients to pay by using notices falsely contrived to appear as official legal notices, would use the term "U.S. Credit Rating and Reporting Agency" to imply falsely that such collection method was Government sponsored, and would threaten to send out notices to tradesmen ruining the patients' credit locally. The Government contends that for the most part the victims were the poor and uneducated.

The second indictment (67 Cr. 513) was handed down, according to the Government, for the reason that the defendants continued the aforementioned activities after the filing of the first indictment on May 15, 1967. The second indictment charges that on five dates between May 17 and 24, 1967, the defendants used the mails for the purpose of executing the same scheme to defraud.

Defendants' motion to dismiss the indictment is denied. In support of this motion defendants' counsel in his affidavit refers to the following items of publicity most of which pre-date the filing of the indictment:

1. Between April 21, 1967 and "the date of the first indictment herein" (May 15, 1967), the office of Dr. Zovluck was the subject of picketing by an "anti-poverty organization."

2. On April 21, 24, 25, 26, 27, 28 and May 15, 1967, Dr. Zovluck's activities were publicized on the television broadcasts of Channel 5, WNEW–TV.

3. On May 20 and June 2, articles appeared in the Spanish language daily, EL DIARIO-La Prensa, describing Dr. Zovluck's activities, and quoting government attorneys as speaking in a manner suggesting a pre-determination of Dr. Zovluck's guilt of the charges against him.

4. Since March, 1966, Dr. Zovluck has been under investigation by the Office of the District Attorney of New York County and the Division of Professional Conduct of the Department of Education of the State of New York. In June,

1967 the Grand Jury of the County of New York returned an information against him, and since March 28, 1967, charges of unprofessional conduct brought against him by the Department of Professional Conduct have been on trial. On November 9, 1966 a summons was served on codefendant Eisenstein by the Department of Health charging violations of the Health Code in regard to x-ray equipment. This is to go to trial September 12, 1967.

Although the affidavit of defendants' counsel charges that the Government conducted press conferences, issued publicity releases, and permitted (and, it is intimated, encouraged) the presence of a photographer at certain proceedings in this case, defendants fail to state any facts connecting the Government with the aforementioned publicity, and the Government states in its brief that "There was no pre-indictment publicity which could even remotely be claimed to have emanated from the government". This is confirmed by the defendants' recital of the background, which indicates that the pre-indictment publicity grew out of activities of private citizens attempting to protect the public against the alleged fraudulent conduct by exposing it to potential victims.

The Government, upon the filing of the first indictment, apparently issued a press release or made comments to the press, the exact contents of which are not clear from the papers before the Court, since the United States Attorney's Office denies making some of the statements attributed to it and asserts that except for a reference to payment by victims to the defendants it limited itself to matters on public record. The news item furnished by defendants does indicate (and this is tacitly admitted) that the Government informed the press of of the nature of the charges against the defendants and issued a statement advising victims not to make payments in response to dunning notices, but to inform the Post Office. While this Court cannot condone the Government's unnecessary issuance of prejudicial publicity, see United States v. Miller, 381 F.

2d 529 (2nd Cir. July 26, 1967), or the use of such publicity as a means of obtaining evidence or locating witnesses, the Government asserts that its purpose was to advise the public of the charges so that it would be protected against defendants' continued fraudulent activities, and contends that the defendants did in fact continue their alleged frauds resulting in a second indictment. See American Bar Association "Standards Relating to Fair Trial and Free Press" recommended by its Committee on Minimum Standards for Administration of Criminal Justice, Dec. 1966, pages 2 (Part 1.1) and 5 (Part 2.2).

■ In any event, whether or not the Government's communications to the press were justified, the publicity here would not constitute grounds for dismissal of the indictment, which would be an unprecedented step. Nor would it appear to require a continuance, a change of venue, or use of the more conventional remedies invoked to dissipate, or leave behind, the prejudicial effect of publicity which threatens a fair trial. The amount of publicity appears to have been infinitesimally small compared with the body of news material into which it was injected. It was not widely, prominently or frequently held up to the public over a substantial period of time. It was, in effect, a mere drop in the bucket, unlikely to have been seen, much less remembered, by the great majority of the public, or to have had any lasting influence on those few who were exposed to it. Its influence, therefore, falls far short of the permeating effect found in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In an area where it has been said that "each case must turn on its own special facts", Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959) the factual distinctions from *Sheppard* are enormous. The case of Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), also cited by defendant is wholly distinguishable.

Moreover, it is now eleven weeks since the last alleged incident of prejudicial T.V. or newspaper publicity. It is highly unlikely that this case will go to trial before September, at least thirteen weeks from the last incident. The Second Circuit has recently noted the effectiveness of delays of 16 and 12 weeks in cleansing the atmosphere of pre-trial publicity. See, United States v. Armone, 363 F.2d 385, 395 (2d Cir.), cert. denied, 385 U.S. 957, 87 S.Ct. 398, 17 L.Ed.2d 303 (1966); United States v. Bowe, 360 F.2d 1, 11 (2d Cir.), cert. denied, 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966). The Court quoted the observation of Judge Weinfeld that "frequently in this large metropolitan district prospective jurors show little recall of past widely publicized matters—" United States v. Kahaner, 204 F.Supp. 921, 924 (S.D.N.Y.1962).

There has been a failure to demonstrate any real likelihood of prejudice. It appears most likely that when a jury is selected, *voir dire* will reveal the entire panel to be completely unaware of these incidents complained of by the defendant. Certainly there is no reason at this time seriously to doubt that it will be possible to select an unprejudiced jury. Should events at trial demonstrate this assumption to be false, it will be time then to consider remedial measures.

■ Defendants also seek to have the indictment dismissed on the ground that they were prejudiced by the conduct of Government counsel before the Grand Jury. The exact nature of this prejudice is not spelled out, but apparently it rests on such things as the pre-indictment publicity, the apparent presence of a photographer in the anteroom while the Grand Jury was in session, the fact that defendants were called before the Grand Jury as witnesses even though their attorney had previously advised the Government that they would refuse to testify in reliance on their Fifth Amendment rights, the allegation that witnesses before the Grand Jury gave false and prejudiced testimony, and the like. This motion is without merit. There is no

real indication that the Grand Jury was affected by, or even aware of, the pre-indictment publicity which was not of any unusual quantity, or that they knew of the presence of the photographer in the anteroom. It is well settled that an indictment returned by a legally constituted Grand Jury is sufficient to call for a trial on the merits, and this Court will not review the action of the Grand Jury in the absence of a clear showing of special circumstances. Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); United States v. Ramsey, 315 F.2d 199 (2d Cir.), cert. denied, 375 U.S. 833, 84 S.Ct. 153, 11 L.Ed.2d 113 (1963). It is elementary that the indictment is merely a charge which must be proved at trial beyond a reasonable doubt before the defendants may be convicted. At trial the defendants will have the benefit of all of the customary procedural safeguards to assure that their trial is a fair one, and the determinations of the trial judge will be subject to appellate review. In the face of such safeguards it would be wasteful and unnecessary for this Court to set out in pursuit of the will-of-the wisps of prejudice suggested by the defendants' motion papers.

### MOTIONS TO VACATE SEIZURE

■■ Neither of the grounds urged by defendants in support of their motions to vacate the search warrants issued in this case and for the return of the property seized appear to be supportable. First it is urged that the warrants were "an abuse of process", being designed to put the defendants out of business. All of the items seized, however, appear to be instrumentalities of the alleged crimes, or evidence thereof, the seizure of which is clearly authorized. See Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). That the records of an allegedly unlawful enterprise constitute instrumentalities of the alleged crimes is well settled, Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927); United States v. Markis, 352 F.2d 860 (2d Cir. 1965); United States v. Lindenfeld, 142 F.2d

829 (2d Cir.), cert. denied, 323 U.S. 761, 65 S.Ct. 89, 89 L.Ed. 609 (1944). Moreover, since the Court in *Marron* reasoned that the "bottles, liquors and glasses" were a clearer case for seizure than the business records, and the Second Circuit upheld the seizure of pens, calendars and telephones as part of a gambling enterprise, United States v. Markis, supra, 352 F.2d at 864–865, the seizure of the x-ray machines, typewriter, and telephones in the instant case does not appear unreasonable.

■ A reading of the warrants is sufficient to dispose of the defendants' contention that they do not adequately identify the property to be seized. Suffice it to say that they are more than amply sufficient in this regard. See United States v. Clancy, 276 F.2d 617, 629 (7th Cir. 1960), reversed on other grounds, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961).

Defendants move in the alternative for an order directing the return of all property seized beyond the scope of the search warrants, contending that the warrants were "overexecuted", with the result that more property was seized from Dr. Zovluck's office than was authorized by the warrants for the search of that office, and that property was taken from the mail box in the lobby of the Hotel Iroquois when a third search warrant authorized only a search of Room 36 of that hotel. The Government replies (1) that the items seized were covered by the various warrants, (2) that the items were properly seized incident to valid arrests, and (3) that the letters were not in fact seized in the lobby.

■ Since the Marshal's return concedes that the letters were seized in the lobby, and the Government offers no facts to the contrary or justifying the seizure on some other basis (e. g. incident to arrest), the letters will be suppressed and returned to the defendant. The authority to search is limited to the place described in the warrant and does not include additional or different places. Keiningham v. United States,

109 U.S.App.D.C. 272, 287 F.2d 126, 129 (1960).

In the absence of a detailed inventory of the seized property, the contention of the Government that the searches of May 15 and June 5 did not exceed the scope of the warrants is open to serious question. For instance, the seizure of *all* medical records other than those of the individuals named in the warrant on May 15 would be a seizure in excess of the authorization of the warrant. However, the record is uncontroverted that the seizure was incident to an arrest pursuant to a warrant the validity of which is undisputed. The fact that officers possess a search warrant does not preclude their lawfully seizing fruits and instrumentalities that are not described in the warrant, Marron v. United States, supra; Johnson v. United States, 110 U.S.App.D.C. 351, 293 F.2d 539, 540 (1961), cert. denied, 375 U.S. 888, 84 S.Ct. 167, 11 L.Ed.2d 118, and, since Warden v. Hayden, supra, evidence as well. Although the Supreme Court has condemned general exploratory searches "with or without a warrant", United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932); Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931), a search of the premises where the arrest is made for the fruits and instrumentalities of the crime for which the arrest was made, is proper, United States v. Rabinowitz, supra. The Court is strengthened in this conclusion by more recent cases such as Johnson v. United States, 110 U.S.App.D.C. 351, 293 F.2d 539 (1961), cert. denied, 375 U.S. 888, 84 S.Ct. 167, 11 L.Ed.2d 118 (1963) and United States v. Barbanell, 231 F. Supp. 200 (S.D.N.Y.1964) (Feinberg, J.), in the latter of which Judge Feinberg analyzed the decisions and concluded the type of general search that is proscribed is one for material connected with crimes unrelated to the ones alleged in the complaint. Since the officers in this case limited themselves to searching for and seizing material related to the crimes charged in the indictment, the search and seizure was not illegal and the material seized will not be suppressed.

## MOTION FOR INVENTORY OF SEIZED PROPERTY

Defendants also request that the Government be ordered to provide them with a full and adequate inventory of the property seized under the several search warrants. This appears to be a reasonable request. Such descriptions as "1 mail bag of records" are inadequate. The Government should identify each record in its possession by date and general nature.

## MOTION FOR RETURN OF SEIZED PROPERTY

Finally, defendants seek an order requiring "the immediate return of all treatment records, payment records and x-ray plates seized, or alternatively, the provision of complete copies thereof" in order to enable defendants to conduct their business and prepare for trial. The Government counters with the contention that defendants desire the records for the purpose of continuing their alleged illegal activities, including the dunning of "free" patients for money, just as they allegedly did after the filing of the first mail fraud indictment on May 15, 1967. To the extent that the defendants complain that items needed for conduct of their business are being wrongfully withheld by the Government their proper remedy is a civil action. See Warden v. Hayden, supra. Treating this motion as one made under Rule 16(b) F.R.Crim.P., however, the Court notes that defendants have stated that they need the records so that they can locate patients who will testify for the defense, cross-examine patients who may be called by the Government, and determine the condition of these patients, what treatment was rendered to them, and what bills were submitted to and paid by them. These reasons meet the test of materiality imposed by Rule 16 (b). However, in view of the genuine apprehension voiced by the Government as to the defendants' motives and misuse of

the records, a blanket turnover of the records would not appear to meet Rule 16(b)'s requirement of reasonableness. Accordingly, the Court directs that the defendants shall be permitted to inspect the seized materials in the Government's possession for the purpose of designating (without copying) those records represented to be needed by the defendants for trial preparation purposes, copies of which shall be furnished by the Government to the defendants at the latter's expense upon receipt of a written representation by the defendants that such records are needed by them to prepare for trial, and that, pending trial of the mail fraud indictments, they will not use the records to engage in any of the activities alleged in such indictments, including requests of, or demands upon, any persons for payment of money. The latter condition shall constitute an order of the Court.

## MOTION FOR BILL OF PARTICULARS

Defendant Eisenstein, one of the co-defendants in the principal case, here indicted under 18 U.S.C. § 111 (67 Cr. 469) for having "forcibly assaulted, opposed, impeded and interfered with" two United States Deputy Marshals, brings the motion for a bill of particulars.

Number one requests the Government to "State whether it will be alleged that defendant 'assaulted' both Deputy United States Marshals named in the indictment; if not, state which Deputy United States Marshal defendant 'assaulted.'" This request will be granted.

Number nine requests that the Government "Identify precisely the portion of premises 126 West 42nd Street, New York, N.Y. wherein the acts alleged in the indictment took place (i. e. state whether they occurred in the waiting room, public hallway, consultation room #1, x-ray room, etc.)." This request will also be granted.

The remainder of the requests are denied for the reason that they seek mere evidentiary details, which is not the function of a bill of particulars. The indict-

ment adequately informs defendant of the conduct with which he is charged so that he may prepare for trial, avoid being surprised at trial, and be able to plead double jeopardy in event of a second prosecution based on the same facts. See United States v. Cimino, 31 F.R.D. 277 (S.D.N.Y.1962); United States v. Bentvena, 193 F.Supp. 485, 498–501 (S.D.N.Y.1961); United States v. Bonanno, 177 F.Supp. 106, 119–121 (S.D. N.Y.1959).

## MOTION FOR CONSOLIDATION OF INDICTMENTS 67 Cr. 485 AND 67 Cr. 513 FOR TRIAL

The above indictments charge the identical offenses, except for the dates thereof, and the offenses charged in the second (67 Cr. 513) are alleged to be a continuation of the same fraudulent scheme charged in the first. The defendants do not oppose consolidation for trial. Accordingly, such consolidation is granted.

So ordered.