**UNITED STATES of America,**
**Plaintiff,**

v.

**ABBOTT LABORATORIES, a corporation, et al., Defendants.**

**Crim. No. 3897.**

United States District Court,
E. D. North Carolina,
Wilson Division.

Dec. 13, 1973.

Thomas P. McNamara, U. S. Atty., Eastern District of North Carolina, Raleigh, N. C., Charles R. McConachie, Howard S. Epstein, Sp. Attys., Consumer Affairs Section, Antitrust Div., U. S. Dept. of Justice, Washington, D. C., Arthur N. Levine, Atty., Food and Drug Div., U. S. Dept. of Health, Education and Welfare, Washington, D. C., Peter Barton Hutt, Asst. Gen. Counsel, Food, Drugs and Product Safety Div., U. S. Dept. of Health, Education and Welfare, Washington, D. C., for plaintiff.

George M. Burditt, James R. Phelps, Burditt & Calkins, Chicago, Ill., James C. Little, Hatch, Little, Bunn, Jones & Few, Thomas F. Ellis, Maupin, Taylor & Ellis, Raleigh, N. C., Louis B. Meyer, Lucas, Rand, Rose, Meyer, Jones & Orcutt, Wilson, N. C., Lindsay C. Warren, Jr., Taylor, Allen, Warren & Kerr, Goldsboro, N. C., C. Kitchin Josey, Josey & Vaughan, Scotland Neck, N. C., John R. Jolly, Jr., Spruill, Trotter & Lane, Rocky Mount, N. C., for defendants.

## MEMORANDUM OPINION and ORDER

LARKINS, District Judge:

This cause is now before this Court on defendants' separate motions to dismiss the indictment on two grounds:

(1) That they cannot receive a fair trial because of prosecution inspired, false, and inflammatory publicity which imputed either nine deaths or 50 deaths to the defendants, which the prosecutors knew were not a factor in the trial of the case.

(2) That they are entitled to have the indictment dismissed because of prosecutorial misconduct before the grand jury.

The defendants argue in support of their motion to dismiss because of prejudicial pre-trial publicity that a fair trial has been precluded by the prosecution's deliberate nationwide dissemination of highly inflammatory and prejudicial publicity, unsupported in fact. Defendants contend that because the indictment consists of allegations of sixty (60) misdemeanors under a statute which requires proof neither of intent nor of knowledge, the agents of the Department of Justice and of the Food and Drug Administration engaged in shocking misconduct by releasing statements to the press which raised the specter of homicide by imputing to the defendants the deaths of either nine (9) or fifty (50) persons while knowing that the charges were without substantiation and not a factor in the impending trial.

The Government denies any prosecutorial misconduct and points out that the conduct and publicity complained of occurred subsequent to the return of the indictment. Therefore, prosecution argues, the indictment itself is considered to have been legally and properly procured by the government because the defendants have not alleged that the prosecutors poisoned the minds of the grand jury by generating false and misleading pre-indictment publicity.

Furthermore, the Government contends that defendants' argument that prejudicial publicity has denied them the constitutionally guaranteed right to a fair trial is premature because no trial date has been set nor has the question of venue been reached. The Government also charges that the defendants were not hurt by this publicity in this district.

In a separate motion to dismiss the defendants move to have the indictment dismissed on the grounds of prosecutorial misconduct before the grand jury. Defendants claim that even though the government admits that deaths are in no way involved in this case, the prosecutors repeatedly flaunted the stories of deaths before the grand jury; and that this was done in such a manner as to inflame unduly the members of the grand jury, and thereby created such bias in the grand jury that the indictment is inherently suspect and should be dismissed.

The Government denies any and all allegations of misconduct regarding the presentation of this case to the grand jury. The Government contends that the defendants have failed in their burden to show irregularity attendant to the grand jury proceedings. Furthermore, the Government does not concede that the subject of septicemia, possible deaths, and illnesses are irrelevant in this case.

### THE FACTS

Proceedings in this case began being conducted before the grand jury of the United States District Court for the Eastern District of North Carolina on January 23 and 24, 1973, in Raleigh, North Carolina. The investigation continued on May 7, 1973 and May 29, 1973. With the exception of May 29th, complete transcripts were made of all the proceedings.

The transcripts reveal that the proceedings before the grand jury were being routinely conducted until the examination of Robert O'Donnell, one of the present defendants in this case. Up until the questioning of Mr. O'Donnell the Government had not raised the issue of deaths in connection with this case. On examining Mr. O'Donnell, Mr. Howard S. Epstein, one of the special prosecutors of the Department of Justice, posed the following questions:

"Q. My recollection is, and I think that you can help me with that, they had a couple of dead bodies in Denver from Abbott I.V. solutions, isn't that right?" (Grand Jury Transcript, page 187)

\* \* \* \* \* \*

"Q. Let's see now if we can refresh your recollection with exactly what was at the Henry Ford Hospital in Detroit. I want to show you a photocopy of what is captioned the Detroit Newspaper of March 14, 1971, with the headline that says: Faulty Bottle Caps Blamed in Nine Deaths, the Detroit Free Press of March 16, 1971, Eight Hospital Deaths tied to Tainted Bottle Caps, March 16, 1971, Detroit Free Press: Painstaking Search Leads to Guilty Bottle Cap, and on March 17, 1971, from the Detroit News: Hospital Blood Poison Deaths were Linked to Water, and the Detroit News of March 17, Identities of Tainted Fluid Victims Withheld. Let me see if this will help you refresh your recollection about Henry Ford Hospital in Detroit?" (Grand Jury Transcript, pages 187–188)

\* \* \* \* \* \*

"Q. Did she tell you the Detroit News were crazy as bed bugs that there was these dead bodies in Detroit from using Abbott I. V. Solutions." (Grand Jury Transcript; page 190)

On May 29, 1973 the grand jury investigation continued with testimony from John Bennett, M.D., Center for Disease Control in Atlanta. The prosecution stated it did not have a Court Reporter available to transcribe his testimony because Dr. Bennett had a terminal illness in his family which required his immediate return to Atlanta.

The prosecutors appeared that day with a prepared indictment naming the five individuals in addition to Abbott Laboratories, which had been concurred in or approved by the Food and Drug Administration through Mr. Peter Hutt. After the testimony of Dr. Bennett the prosecutors discussed the proceedings with the grand jury. Mr. Charles R. McConachie, the other special prosecutor of the Department of Justice, admitted that deaths were probably mentioned to the grand jury during the discussion of the recommended indictment.

Shortly after noon, of that same day, the grand jury returned an indictment charging the defendants with sixty (60) misdemeanors. These sixty (60) counts alleged that the defendants caused to be introduced and delivered for introduction into interstate commerce adulterat-

ed and misbranded drugs in violation of the Federal Food, Drug, and Cosmetic Act.

Prior to May 29, 1973, a press release naming the defendants and the charges had been prepared by the Department of Justice in Washington, D.C. This press release was brought to the United States Attorney's office in Raleigh by Mr. Howard Epstein and Mr. Charles R. McConachie. The press release was to be retyped in the United States Attorney's office and issued to the news media as soon as the Indictment was returned.

After noon, on May 29, 1973, the United States Attorney's office notified various news media of the press release concerning the Indictment. Channel 5, WRAL–TV, a Raleigh television station requested an interview which was granted. Ms. Lorraine Moore, a WRAL–TV reporter, arrived with a cameraman for the interview that same afternoon at about 2:00 p.m. The interview was with Mr. Thomas P. McNamara, United States Attorney, but Mr. Epstein and Mr. McConachie were also present. Arriving a few minutes later was Mr. Arthur Levine, an attorney with the Federal Food and Drug Administration.

Before the taped interview began, Mr. McNamara, as is his custom, had Lorraine Moore submit the questions to be asked for his study and inspection. There was not a question involving injury, illness, or death. During this time, Ms. Moore asked if any deaths or illnesses were attributed to the misbranded drugs. Mr. Epstein, the government attorney who is apparently in charge of the prosecution of this case, indicated yes, "the Center for Disease Control in Atlanta previously reported that nine deaths occurred in 1971."

In the taped interview before the camera Mr. McNamara was apparently surprised by Ms. Moore's final question, which was the same question concerning deaths and illnesses answered by Mr. Epstein. However, Mr. McNamara replied that "the Indictment had nothing

to do with any deaths." There is also evidence to indicate that Lorraine Moore continued to ask questions concerning deaths and illnesses. This, of course, was off camera. She apparently received answers to some, but not all, of these questions.

Later the same day, on the WRAL–TV six o'clock evening news, the news report concerning the Indictment in this case began with the following sentence:

"Nine deaths and four hundred illnesses have been attributed to contaminated drugs made by a North Carolina Company."

The announcer, Charlie Gaddy, went on to add that "the drugs were manufactured by the Abbott Laboratories Hospital Products Division of Rocky Mount." He also mentioned that five individuals were indicted along with the Abbott corporation, however the individuals were not named. The interview with Lorraine Moore followed, however, Mr. McNamara's statement that the "deaths had nothing to do with the Indictment" was not shown to the television viewers.

That afternoon and evening the Indictment and the "nine death story" received extensive coverage, throughout the entire country, on radio, television, and in the newspapers. However, the dissemination of the "nine death story" cannot be entirely attributed to the remark made to Ms. Moore by Mr. Epstein. At approximately the same time Mr. Epstein was talking to Ms. Moore, a United Press International wire story was released from Washington, D.C., reporting the Indictment and containing the "nine death story." Thus, while Mr. Epstein's remark concerning deaths and illnesses can be directly attributed to the WRAL–TV news report, it was not the source of the nationwide dissemination of the "nine death story." However, the United Press International wire story expressly stated that the Department of Justice was the source of this story.

Also released to the news media that afternoon after the WRAL–TV interview was another news report concern-

ing the Indictment and the defendants. The source of this news story was the Federal Food and Drug Administration (F.D.A.) of the United States Department of Health, Education, and Welfare. The F.D.A. is the agency that recommended this prosecution to the United States Attorney for the Eastern District of North Carolina. This F.D.A. press release stated:

"The Center for Disease Control, Atlanta, Georgia, reported 50 deaths from 412 patient episodes during late 1970 and early 1971 from Septicemias (blood poisonings) which CDC determined to be associated with the use of contaminated Abbott intravenous solutions."

The release noted that an F.D.A. and C.D.C. inspection "revealed the presence of the contaminating bacteria in the plant environment." It then stated "the presence of these bacteria in the product was due to the inadequacy of Abbott's closure system for the product," giving a brief description. It concluded by naming the five individual defendants and stating the following:

"These individuals held positions of responsibility with respect to the adulteration and misbranding for the intravenous drugs named in the Indictment."

This "fifty death story" received much greater nationwide coverage than did the "nine death story."

At the conclusion of the WRAL–TV press interview, Mr. Arthur Levine first phoned Mr. Peter Barton Hutt, assistant general counsel of the Food and Drug Administration, and informed him of the Indictment. Although the F.D.A. does not issue a press release in every case, Mr. Hutt and Mr. Levine had prepared one in this case on May 24, 1973, five days before the Indictment was handed down. Mr. Hutt instructed Mr. Levine to call Mr. Jack Walden, Deputy Assistant Commissioner for Public Affairs of the F.D.A., concerning the agency's press release in this case. Mr. Walden was in charge of publicity and he had possession of the press release pre-pared by Mr. Hutt and Mr. Levine. The Indictment was confirmed by Mr. Levine and Mr. Walden prepared to issue the press release.

Before issuing the press notice Mr. Walden decided to contact the Center for Disease Control and update the information on deaths and injuries which was included in the press release prepared by Mr. Hutt and Mr. Levine. The Center for Disease Control, a federal agency, gave Mr. Walden the figures of 50 deaths and 412 injuries. With the exception of a scientific seminar by C.D.C.'s technical personnel and a scientific article then under publication by C.D.C., Mr. Walden was the first to obtain these figures for nationwide publicity. Mr. Walden, who is not an attorney, updated the number of deaths and injuries mentioned in the press release prepared by Mr. Hutt and Mr. Levine and issued it to the news media late in the afternoon of May 29, 1973.

Hearings were held before this Court in New Bern, North Carolina, on defendants' motion to dismiss because of prejudicial pre-trial publicity on August 2–3, 1973, and on September 12, 1973, the Court conducted an extensive inquiry with all parties present, into the activities of the government attorneys before the grand jury and after the indictment. This opinion is the result of these hearings and consideration by the Court of briefs, memoranda, affidavits, and numerous exhibits submitted by the parties in this case.

## CONCLUSIONS OF LAW

The defendants were originally ordered to appear for arraignment before this Court on July 16, 1973, at New Bern, North Carolina. The offenses charged in this Indictment are "minor offenses" in that the penalty for each "does not exceed imprisonment for a period of one year, or a fine of not more than $1,000, or both," Title 18, U.S.C., Section 3401(f), and, therefore, may be tried before a United States Magistrate under Title 18, U.S.C. Section 3401(a), as provided for by General Rule 19 of

the Local Rules of the United States District Court for the Eastern District of North Carolina.

Special prosecutor Charles R. McConachie acknowledged that the Government did consider bringing this case before a magistrate. He stated:

> "Obviously when we first got into this we did think about the possibility of filing a complaint before the Magistrate . . ." Hearing Transcript, September 12, 1973, page 144.

However, the Government abandoned this idea and brought the case directly before this Court.

Rule 1, subd. j of the United States District Court for the Eastern District of North Carolina adopts as the rules of this Court the American Bar Association's Code of Professional Responsibility. The Disciplinary Rules of the A.B.A. Code provides, concerning "Trial Publicity," that:

> "(B) A lawyer or law firm associated with the prosecution or defense of a criminal matter shall not, from the time of the filing of a complaint, information, or indictment, the issuance of an arrest warrant, or arrest until the commencement of the trial or disposition without trial, make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that relates to:

> \*　　\*　　\*　　\*　　\*　　\*

> (6) Any opinion as to the guilt or innocence of the accused, the evidence, or the merits of the case." DR 7–107(B)(6), ABA Code of Professional Responsibility.

Furthermore, the Government prosecutors in this case are under the rules of the Department of Justice, 28 C.F.R. 50.2, which provide:

> "(b) Guidelines to criminal actions.

> (1) These guidelines shall apply to the release of information to news media from the time a person is the subject of a criminal investigation until any proceeding resulting from such an investigation has been terminated by trial or otherwise.

> (2) At no time shall personnel of the Department of Justice furnish any statement or information for the purpose of influencing the outcome of a defendant's trial, nor shall personnel of the Department furnish any statement or information which could reasonably be expected to be disseminated by means of public communication, if such a statement of information may reasonably be expected to influence the outcome of a pending or future trial.

> (3) . . . Disclosures should include only incontrovertible, factual matters and should not include subjective observations. In addition, where background information or information relating to the circumstances of an arrest or investigation would be highly prejudicial or where the release thereof would serve no law enforcement function, such information should not be made public.

> (4) . . .

> (5) Because of the particular danger of prejudice resulting from statements in the period approaching and during trial, they ought strenuously to be avoided during that period. Any such statement or release shall be made only on the infrequent occasion when circumstances absolutely demand a disclosure of information and shall include only information which is clearly not prejudicial.

> (6) The release of certain types of information generally tends to create dangers of prejudice without serving a significant law enforcement function. Therefore, personnel of the Department should refrain from making available the following:

> .　　.　　.　　.　　.　　.

> (iii) Reference to investigative procedures such as fingerprints, polygraph examinations, ballistic tests, or

laboratory tests, or to the refusal by the defendant to submit to such tests or examinations.

. . . . . .

(v) Statements concerning evidence or argument in the case, whether or not it is anticipated that such evidence or argument will be used at trial.

(vi) Any opinion as to the accused's guilt, or the possibility of a plea of guilty to the offense charged, or the possibility of a plea to a lesser offense."

■ This Court finds as a fact that prejudicial pre-trial publicity was disseminated to the press by Special prosecutor Epstein, by the Department of Justice, and by the Food and Drug Administration. While 28 C.F.R. applies to the Department of Justice, the actions of F.D.A. officials Hutt and Levine, both attorneys, are governed by the rules of this Court and the A.B.A.'s Code of Professional Responsibility. The F.D.A. is the agency that recommended prosecution in this case. Mr. Levine worked very closely with Mr. Epstein and Mr. McConachie for an extended period of time. He reported directly to Mr. Hutt informing him of the progress of the case. Mr. Epstein and Mr. McConachie testified that they were aware of the danger of possible prejudicial pre-trial publicity, as did Mr. McNamara who tried to prevent it.

Yet Mr. Hutt and Mr. Levine prepared a press release in this case five (5) days before the Indictment was handed down which mentioned deaths in connection with this misdemeanor case. Furthermore, Mr. Levine was present at the WRAL–TV press interview when Mr. McNamara admonished Ms. Moore that "the Indictment had nothing to do with the deaths." Nevertheless, Mr. Levine proceeded to contact Mr. Hutt and Mr. Walden concerning the issuance of a F.D.A. press release, which he helped prepare, and, therefore, knew to contain information involving deaths, injuries, and this misdemeanor indictment.

Mr. Hutt admitted in open court that the F.D.A. press release was issued because he was being "hounded" by the press and that there were "enormous" press inquiries. However, Mr. Hutt contends that the press release was not done in some type of conspiracy with his colleagues from the Department of Justice. This is not an issue because there did not have to be a conspiracy between the F.D.A. and the Department of Justice for the defendants to be unduly prejudiced by pre-trial publicity.

The plaintiff in this case is the Government. The Department of Justice, F.D.A., and C.D.C. are departments and agencies of the Government. The oneness of these departments and agencies can be seen in their working relationship. The F.D.A. recommended that this action be brought against Abbott Laboratories and Mr. Levine selected the place that the charges were to be brought. The Department of Justice insisted that the five individuals be included as defendants. Mr. Epstein stated he had difficulty in getting the F.D.A. to agree to the individuals but he subsequently prevailed. Mr. Levine of the F.D.A. worked "daily" with Mr. McConachie and Mr. Epstein of the Department of Justice. Mr. Epstein was in charge of the prosecution. Therefore, there did not have to be an overt conspiracy in this case, the actions of one are attributable to the other because they are part of the whole.

In this case, however, both the Department of Justice and the F.D.A. contributed its own "death story" thereby prejudicing the defendants. The F.D.A.'s "death story" just happened to be bigger and more detailed than the Department of Justice's. The F.D.A.'s "death story" also can be traced to definite individuals who were seeking publicity. Mr. Walden, F.D.A. Deputy Assistant Commissioner for Public Affairs, had worked with this case since 1971 and was very familiar with it. He stated in open court that he "knew that the public interest and the press interest

turned very much on the figures relating to deaths and injuries." This press release was not an effort to get Abbott Laboratories to remove alleged contaminated I. V. Solutions from the public, Abbott had recalled the product in question in March, 1971, two years before this "Fifty death" press release. Therefore, the F.D.A.'s press release was not made in the interest of public health and safety, it was self-serving in an effort to pacify a demanding press.

The present case, therefore, does not solely involve prejudicial publicity, it involves prejudicial publicity disseminated by a Government prosecutor, the Department of Justice, and the Food and Drug Administration. Dissemination by the prosecutor of "incompetent and prejudicial information about the case or the defendant," has been condemned in this Circuit. United States v. Milanovich, 303 F.2d 626 (4th Cir. 1962). The Court in *Milanovich* stated:

> "If the prosecutor, an officer of the court, is implicated in the dissemination of such information, the occurrence should be scrutinized with special concern." *Supra* at p. 629.

In *Milanovich*, the defendant raised the misconduct of the prosecutor as a technical matter, conceding that "by no possibility could the broadcasts have had any influence." In the present case, however, the press release contained hotly disputed and prejudicial information concerning deaths, which received nationwide coverage, and which continues to appear in the press whenever any action is taken in this case. The F.D.A. public relations officer who testified before this Court acknowledged that he knew that the "death" portion of the press release would be the most newsworthy aspect of the release. The prosecutors' conduct in this case is therefore far more opprobrious than the conduct condemned by the Fourth Circuit in *Milanovich*.

Three remedies less drastic than dismissal have been invoked in other cases: (1) voir dire; (2) a continuance; and (3) change of venue. The government

suggests that some or all of these remedies would purge the constitutionally suspect air in this case. Defendants contend that these remedies, individually and collectively, are inadequate. Because the prejudicial publicity was disseminated by the prosecutors, because it is reoccurring, and after a careful review of the opinions and facts in the relevant cases, this Court agrees with the defendants.

As to voir dire, the Supreme Court has recently made it clear that where improper publicity generated with the complicity of the state's officers has infected the community and relates directly to the case to be tried, voir dire cannot adequately protect the defendants. Groppi v. Wisconsin, 400 U.S. 505, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971); Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); Pamplin v. Mason, 364 F.2d 1 (5th Cir. 1966). In considering ways to assure the kind of impartial jury that the Constitution guarantees, the Supreme Court in *Groppi* stated:

> "Here we are concerned with the methods available to assure an impartial jury in a situation where, because of prejudicial publicity or for some other reason, the community from which the jury is to be drawn may already be permeated with hostility toward the defendant. The problem is an ancient one. Mr. Justice Holmes stated no more than a commonplace when, two generations ago, he noted that '(a)ny judge who has sat with juries knows that, in spite of forms they are extremely likely to be impregnated by the environing atmosphere.' Frank v. Mangum, 237 U.S. 309, 349, 35 S.Ct. 582 [595], 59 L.Ed. 969 [989] (dissenting opinion)." *Supra*, 400 U.S. at p. 509, 91 S.Ct. at p. 493.

Viewing the facts and circumstances in this case in their totality, this Court

finds that voir dire cannot be used to protect the defendants. The defendants have shown that the prejudicial pre-trial publicity disseminated by the prosecutors' nine death statement to the television reporter in Raleigh, and the prosecutors' F.D.A. 50 death news release which stated other conclusions sufficiently infected the community so that voir dire cannot be used to guarantee the defendants' constitutional right to a fair trial.

The prosecutors intentionally, either by design, carelessness, or overzealousness, created the cloud of prejudicial publicity surrounding this case. This distinguishes this case from Wansley v. Slayton, 487 F.2d 90, (4th Cir., 1973), where the prejudicial publicity did not reach the press through the prosecutors.

Also the remedy of voir dire is inadequate because of the reoccurring publicity in the case. The "fifty death story" appeared in three Eastern North Carolina newspapers when the defendants were arraigned. It also appeared in the 1973 issue of the *FDA Consumer* for the month of September. Even if an impartial jury could be initially selected, the possibility of a juror recalling the prejudicial publicity and having to disqualify himself is tremendous. Therefore, under the circumstances in this case, a trial that used voir dire would be constitutionally suspect.

As to a continuance, the government contends that the mere passage of time will adequately protect the defendants, citing Stroble v. California, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952); United States v. Bowe, 360 F.2d 1 (2nd Cir. 1966), cert. denied, 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966); United States v. Zovluck, 274 F.Supp. 385 (S.D.N.Y.1967), and United States v. Armone, 363 F.2d 385 (2nd Cir. 1966). However, these cases are readily distinguishable on their facts from the present case. In addition, all of these cases antedate Barker v. Wingo, 407 U. S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), in which the Supreme Court carefully analyzed the matter of unreasonable delay and laid down guidelines to be followed by trial courts. Defendants contend that a continuance will not remedy the prejudicial pre-trial publicity released by the prosecutors, and that continued delay will deprive them of a right to a speedy trial. The Supreme Court in Barker v. Wingo, *supra*, in considering unreasonable delay in trials, adopted "a balancing test, in which the conduct of both the prosecution and the defendant are weighed." Using this test, this Court finds the government-generated publicity is the sole justification offered for delay. Furthermore, the 50 death story is in the "morgues" (files) of newspapers throughout the country, and undoubtedly will be referred to whenever this case is reported. This Court has previously noted that it was used in the Eastern District of North Carolina by at least three newspapers when they reported the arraignment of the defendants. Under the test of the *Barker* case, a continuance of this case would not only be improper but would also deny to the defendants their constitutional right to a speedy trial guaranteed them by the Sixth Amendment to the United States Constitution.

As to a change of venue, the government has not suggested that any district in the United States has not been infected with the government-inspired "nine death" and "fifty death" stories. Defendants have produced copies of some 225 newspaper articles, and transcripts of numerous network and local television and radio news reports which picked up the government's nine and fifty death releases. Under these circumstances, this Court finds a change of venue would be a useless gesture.

The only appropriate remedy is dismissal. This is, of course, an extreme penalty to impose on the government. It is, however, imposed because the government, through two of its separate agencies, solely generated the prejudicial publicity. As powerful and efficient as our government is, or can be, its laws and procedures do not have to be prostituted by prejudicial publicity "leaked"

to the press in order to obtain convictions, especially criminal misdemeanor convictions.

This case is clearly distinguishable from United States v. Mitchell, et al., 73 CR. 439 (S.D.N.Y., September 1, 1973), cited by the prosecution, in at least four respects:

1. There is no allegation that the *Mitchell* publicity was false.

2. In *Mitchell* the nationwide publicity could not be attributed to the government prosecutors.

3. In *Mitchell* the Senate committee on which the publicity was centering had agreed to avoid the issues covered in the indictment; here the publicity is concerned solely with the indictment and creates a constitutionally suspect situation by emphasizing deaths.

4. The publicity referred to in *Mitchell* related to matters primarily outside the indictment; here the government generated publicity focused directly on the indictment and the issues to be tried.

For these reasons, this Court was not able to hold as the Court did in *Mitchell* concerning prejudicial publicity.

The second motion considered by this Court involves alleged prosecutorial misconduct before the grand jury. In an Order dated September 12, 1973, this Court denied defendants' motion under Rule 6(e) to inspect or copy the entire grand jury transcript because they had not made a proper showing of probable misconduct before the grand jury. However, in that same opinion and order discovery of defendant O'Donnell's testimony was allowed under Rule 16.

The present motion to dismiss was filed by the defendants subsequent to the Rule 6(e) and Rule 16 discovery motion. In considering the instant motion the court has carefully studied the grand jury transcripts, briefs and memoranda of law submitted by both parties, and the hearing transcripts, in order to view the circumstances concerning the grand jury in their totality.

 This Court is well aware that a grand jury proceeding is not bound by the ordinary rules of evidence and that a prosecutor has rather broad authority as to what may or may not be presented to the grand jury for its consideration. This authority is not boundless, however, and it is clear that a prosecutor exceeds the bounds of his authority when he introduces to the grand jury, by his questions or remarks, extraneous and irrelevant evidence, the primary purpose of which is to inflame and create bias. When this occurs there is no way to ascertain whether proper evidence or the prejudicial conduct of the prosecutor or both prompted the grand jury's action.

> "It is the duty of the prosecutor presenting a case to a Grand Jury not to inflame or otherwise improperly influence the jurors against any person." United States v. DiGrazia, 213 F.Supp. 232 (N.D.Ill., 1963).

The judiciary is the citizen's only bulwark to protect against the tyranny of zealous prosecutors. In *DiGrazia, supra,* the Court in dismissing the indictment quoted an admonishment from Justice Brandeis:

> "(T)he greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."

 This Court finds as a fact that bias and prejudice were created when Mr. Epstein repeatedly referred to deaths from Abbott I.V. solutions. headlines of a newspaper story in a Detroit newspaper, which referred to deaths from Abbott I.V. solution. Deaths were also mentioned on the day the grand jury returned the Indictment, to what extent they were mentioned is unknown because there was no transcript made of that last meeting. To raise the spector of homicide before the grand jury in an effort to obtain an indictment under an act which requires no *mens rea* is unconscionable conduct.

In view of all of the evidence, this Court concludes that dismissal is the only appropriate remedy.

Accordingly, the indictments and all counts thereof are dismissed as to all defendants.