## Staunton

LOUIS MCCLAIN, SOMETIMES KNOWN AS "LOUIE" MCCLAIN
v. COMMONWEALTH OF VIRGINIA.

September 7, 1949.

Record No. 3559.

Present, Gregory, Eggleston, Spratley, Buchanan, Staples and
Miller, JJ.

848

The opinion states the case.

*Curry Carter*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General*, and *C. Champion Bowles, Assistant Attorney General*, for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

The defendant was indicted for the rape of a 14-year-old girl (Code, 1942 (Michie), section 4414). Upon a plea of

not guilty he waived a jury, was tried by the court (Const. of Va., section 8; Code, section 4900, as amended; Acts, 1948, ch. 338, p. 634), convicted and sentenced to 16 years in the penitentiary.

The evidence for the Commonwealth was that on Saturday, July 26, 1947, the prosecutrix had been attending picture shows in Staunton. About five o'clock that afternoon she met defendant, a man 37 years old, on a street corner and he told her that her mother had asked him to bring her home. The prosecutrix lived with her mother and stepfather on Churchville avenue, in Staunton. Defendant told her that before taking her home he wanted to see part of a picture at the Visulite theater and she agreed to accompany him. It was getting dark when they left the theater and they went from there to the automobile of defendant, which was in a parking lot on Baldwin street. On leaving the parking lot, the defendant, with the prosecutrix in his car, drove west past Highland avenue and then turned right on a dirt road. After driving some distance on this road the defendant stopped his car at a place where there were no houses. He began to make advances toward the prosecutrix, which she repulsed. Becoming alarmed, she jumped out of the car, but he caught her, threw her down and ravished her. He then forced her back into the car, refused to take her home, but said he would take her to her grandmother's in Deerfield. They reached there about midnight. The defendant let her out and she went into the house. Her grandmother opened the door for her but no conversation occurred between them that night. The next morning the grandmother noticed the child's nervous condition and apparent illness and questioned her as to the cause. Thereupon the prosecutrix told her what had happened and showed her scratches and bruises on her body. The grandmother kept the prosecutrix in bed for several days and wrote about her to her mother, who came and got her. The following Saturday the child was taken by her mother to the sheriff of Augusta county, to whom she related what had happened and he noted her scratches and

bruises. The next day she was examined by a physician, who found evidence of recent intercourse. The sheriff later talked with the defendant, who admitted being with the prosecutrix on the night in question but denied having sexual relations with her. The defendant admitted that the trip to the home of the grandmother, which was approximately 18 miles from Staunton, took four or five hours, but gave no satisfactory reason for this lapse of time.

The defendant offered no testimony in denial and the court certified that upon arraignment defendant's counsel admitted that the defendant had sexual intercourse with the prosecutrix but would not plead to the indictment, whereupon the court entered a plea of not guilty for him.

The first assignment of error is that the Commonwealth failed to prove venue; that is, that the offense occurred in Augusta county. The evidence for the Commonwealth was heard on October 5, 1948. At its conclusion the defendant moved to dismiss on the ground that the Commonwealth had failed to prove venue. At that time the prosecutrix had testified that the defendant had driven her in his car from the parking lot on Baldwin street, in Staunton, west to West Beverley street at the Thornrose cemetery, thence west on West Beverley street for a distance, past Highland avenue to a dirt road, on which they proceeded a distance to the point where the offense occurred. The sheriff had testified that when the prosecutrix was brought to him, he took her in his car along the route she stated that she had traveled, passed the intersection of West Beverley street and Highland avenue, which marks the corporate limits of the city of Staunton, proceeded west out West Beverley street extended on the Parkersburg pike, passed the intersection of this highway with the Frog Pond road, and passed the Forsythe place to the dirt road at Moore's filling station, leading off to the right and crossing to Route 250 at a point between Churchville and Staunton. He endeavored to have the girl identify the place on this dirt road where the offense occurred, but she could not do so, stating that it was

dark at the time and she only knew that it was at a remote place where there were no houses.

The court certified that in taking judicial notice of the corporate limits of Staunton, he examined an official map of the city, which shows that the western line of the city runs diagonally through Highland avenue and that west of this line is the county of Augusta.

On convening next morning, October 6, the court stated that he had asked the sheriff to take his automobile and measure the distance from the parking lot to Highland avenue by the way the defendant traveled. The court had understood the prosecutrix to testify that they had driven two miles from this point to where the offense occurred. The sheriff thereupon testified that the distance between those points was 1.15 miles; that less than a block of Highland avenue immediately adjacent to its intersection with Beverley street was within the city limits; that Madison avenue, a dirt road, is the first street beyond Highland avenue that goes straight through from West Beverley street extended to the Churchville road, or Route 250, and that no part of Madison avenue was in the city of Staunton. Defendant's counsel then called the prosecutrix for further cross-examination, and on re-direct examination she stated that after the car stopped on the dirt road and the offense was committed, they drove on in the direction the car was headed and then turned off on the Churchville road and into Churchville; and that if Highland avenue was the end of the city limits, then the offense had taken place in Augusta county.

We agree with the court's holding that the evidence, coupled with judicial knowledge of the corporate limits, was sufficient to establish that the crime was committed in Augusta county.

Evidence to prove venue may be direct or circumstantial. *West* v. *Commonwealth*, 125 Va. 747, 99 S. E. 654. The facts proved may be aided by judicial notice of geographical facts that are matters of common knowledge, or shown by maps in common use. It was proper for the

court to take notice of the official map of Staunton and of the boundaries of Augusta county, and to determine the question of venue on the basis of the facts proved and the fair inferences therefrom in the light of that judicial knowledge.

In *Hart* v. *Commonwealth*, 131 Va. 726, 735-6, 109 S. E. 582, there was likewise a question whether the offense occurred in Staunton or Augusta county. We held it to be a geographical fact, "shown by any map in common use, and thus a matter of common knowledge," that the city of Staunton is so located within the county of Augusta that the county surrounds it and extends for more than 15 miles to the west of the corporate limits, of which facts the court would take judicial notice. The opinion quotes from Wharton on Evidence, section 335, to the effect that courts will also take judicial notice of distances as calculated by a map. See also, *Randall* v. *Commonwealth*, 183 Va. 182, 31 S. E. (2d) 571, where it is said that proof of venue is not required except upon timely objection, and where such objection is offered proof may be made by direct or circumstantial evidence or supplied by judicial notice.

The defendant argues that there were turns that the defendant could have made after passing Highland avenue that would have taken him and the prosecutrix back into Staunton. But it is clear from the evidence that they did not so turn, and that the offense occurred on a dirt road on which they turned to the right some distance beyond Highland avenue and thence proceeded over the same road in the same direction until they reached Route 250, between Staunton and Churchville, and then proceeded to Churchville, which is in Augusta county. The evidence and the judicial knowledge of the court furnish ample support for the conclusion that the offense was committed in Augusta county.

The second assignment of error is that the court received and considered evidence after the close of the case and out of the presence of the accused. This complaint is based on the ground that after the Commonwealth closed its case

and the defendant had moved for dismissal for failure to prove venue, the court consulted the map of Staunton and then asked the sheriff to measure the distance as above referred to. On convening next morning, the court announced these facts and stated, "This is all that has transpired since we left the courtroom yesterday afternoon." Thereupon, in the presence of defendant and his counsel, the court called the sheriff to testify as to his measurement, and defendant's counsel called the prosecutrix for further examination as to the place of the crime.

There was no error in this procedure. The order of introduction of testimony is for the determination of the trial court in the exercise of judicial discretion. Its exercise is controlled by the appellate court only in case of plain abuse and prejudice, which is not here shown. *Livingston* v. *Commonwealth*, 7 Gratt. (48 Va.) 658; *Robertson* v. *Atlantic Coast Realty Co.*, 129 Va. 494, 507, 106 S. E. 521, 526; *Butler* v. *Parrocha*, 186 Va. 426, 433, 43 S. E. (2d) 1, 5. A sufficient answer to the other contention is that the record does not show that any evidence was heard out of the presence of the accused, aside from looking at the map, which was not an act of hearing evidence but of applying judicial knowledge.

The remaining assignments of error are based on the fact that the court referred the case to a probation officer for presentence investigation pursuant to section 53-278.1 of the new Code of 1950,[1] of which said section 53-278.1 became effective July 1, 1948 (Senate Journal, 1948, p. 809).

[1] "Section 53-278.1. Investigation by parole or probation officers in certain cases.—When a person is tried upon a felony charge for which a sentence of death or confinement for a period of over ten years may be imposed and waives trial by jury as provided by law, and is adjudged guilty, either upon a plea of guilty or a plea of not guilty, the court shall, before imposing sentence, direct a probation and parole officer appointed under section 53-244 or a probation officer appointed under section 53-266, to investigate and report upon any and all facts tending to show extenuating circumstances, to the end that the court may be fully advised as to the appropriate and just sentence to be imposed. Every probation and parole officer appointed under the provisions of section 53-244, as well as every probation officer appointed under section 53-266, shall thoroughly investigate all cases referred to him for investigation by any court and shall present his report in open court in the presence of the accused who shall

No objection or exception was taken to this procedure. At the conclusion of the hearing on October 6, the court announced that under the law such reference would have to be made and that at a later hearing thereon the defendant would have an opportunity to cross-examine the probation officer as to his report and to "hear any other matter pertaining to the litigation as he sees fit." The report of the probation officer is dated October 13, and on November 23 it was presented to the court in the presence of the defendant, read and explained to him. Counsel for defendant thereupon requested and was granted leave to cross-examine the probation officer and was asked whether he desired time to obtain witnesses to refute parts of this report, which offer was declined by counsel with the statement that he did not want further to delay the matter, but would like to call, and did call and examine, two attorneys of the Staunton bar with respect to two items of the probation officer's report. The report gave a history of the defendant, referred to recent improvement in his employment record, but recommended against probation "at this time."

 These assignments of error might well be disposed of under our Rule 22 for absence of objection to the procedure. It will be observed that the statute is mandatory, and if applicable, failure to obey its mandate would be error. The defendant, having taken his chance on a favorable report, ought not to be heard to object later if he considered it unfavorable. However, we do not rest this decision on that ground, but deem it advisable to decide the questions raised with respect to the statute, as set forth below:

 (1) It is contended that the enactment of said section 53-278.1 violated both the letter and spirit of sections 50 and 52 of the Constitution. Defendant's brief does not point out precisely how it is contended that section 50

be advised of the contents of the same and be given the right to cross-examine the investigating officer as to any matter contained therein and to present any additional facts bearing upon the matter which he may desire to present. The report of the investigating officer shall be filed as a part of the record in the case. * * * "

of the Constitution was violated. That section prescribes how laws shall be enacted. Examination of the 1948 Senate and House Journals fails to disclose that any constitutional requirement was disregarded in the enactment of the law.

Chapter 400 of the Acts of Assembly, 1946, page 970, provided for a recodification of the statute laws of a general nature and for the appointment of a commission to do the work. The commission made its report, which was introduced in the Senate as Senate Bill No. 44 and referred to the committee for courts of justice. (S. J., p. 60). It was reported by that committee with amendments on March 8, 1948 (S. J., p. 668). Committee amendment No. 18 was agreed to and included the addition of a new section, which was section 53-278.1, above referred to (S. J., p. 796). On March 9, the title of the bill was amended to read "A BILL To revise, recodify, arrange and consolidate into a code the General Statutes of the Commonwealth," and it was unanimously passed (S. J., p. 813). On March 10, Senate Bill No. 44, with amendments, was reported to the House of Delegates and referred to its committee for courts of justice (H. J., p. 1031), reported with proposed amendments (H. J., p. 1080), and as amended unanimously passed on March 11. On March 12, the House amendments were concurred in by the Senate (S. J., p. 922), and the bill signed in the Senate (S. J., p. 1039) and in the House (H. J., p. 1294) on March 30, 1948.

Its place of insertion in the bill, and hence in the Code, was under Title 53, "Prisons and Other Methods of Correction," chapter 11, "Probation and Parole."

This recital seems sufficient to negative the argument in defendant's brief that this statute was inserted in the Code without proper consideration of its contents and at a place where it would not normally be looked for. As stated, we see no violation of section 50 of the Constitution in the enactment of the law.

Also, it is well settled that the method of enactment, which, incidentally, was the same method as followed with respect to the Code of 1919, did not violate section 52 of

the Constitution, providing that no law shall embrace more than one object which shall be expressed in its title. As was said in *Macke* v. *Commonwealth*, 156 Va. 1015, 159 S. E. 148, this constitutional provision was not intended to apply to a general Code revision, but its purpose was to prevent the concealment of the real object of a particular statute when separate acts are passed; and hence the adoption of a Code by general title is broad enough to cover any lawful enactment. See also, *Kelly* v. *Gwatkin*, 108 Va. 6, 60 S. E. 749; *Commonwealth* v. *Brown*, 91 Va. 762, 21 S. E. 357, 28 L. R. A. 110; *Narrows* v. *Board of Sup'rs*, 128 Va. 572, 105 S. E. 82.

(2) It is contended that said section 53-278.1, which became effective July 1, 1948, would be an *ex post facto* law, forbidden by section 58 of the Constitution, if applied to the offense here charged, which occurred July 26, 1947, and for which the indictment was returned October 7, 1947.

The classic definition of an *ex post facto* law was given in the early case of *Calder* v. *Bull*, 3 Dall. (U. S.) 386, 1 L. ed. 648. See 11 Am. Jur., Constitutional Law, sec. 348, p. 1176. Such laws are there divided into four classes, the first three of which could have no relation to the statute with which we are here concerned. The fourth class is "every law that alters the legal rules of evidence, and receives less or different testimony than the law required at the time of the commission of the offense in order to *convict* the offender." (Emphasis added).

It was pointed out in *Culbertson* v. *Commonwealth*, 137 Va. 752, 755, 119 S. E. 87, that the above definition has been sometimes misconstrued and misapplied and that not every law that alters the rules of evidence is to be deemed *ex post facto*; but it must be a law which alters the rules of evidence *and* receives less or different testimony than was required at the time of the commission of the offense in order to *convict* the offender. "There is no such thing as a vested right in the mere rules of evidence by which admissible facts are to be established."

A retrospective criminal or penal law that does not

deprive a person of some constitutional right to which he was entitled under the law at the time the offense was committed or does not alter his situation to his disadvantage is not *ex post facto*. 11 Am. Jur., Constitutional Law, sec. 353, p. 1181, and cases cited in note 16.

It is well established that the prohibition against *ex post facto* laws has no application to changes which relate exclusively to the remedy or mode of procedure (*Id.*, sec. 357, p. 1185); and in the absence of statute, a majority of American courts lay down the principle that where the court must determine the punishment to be imposed, either on a finding of a jury or on a plea of guilty, it is correct practice to hear evidence in aggravation or mitigation of punishment. *People* v. *Popescue*, 345 Ill. 142, 177 N. E. 739, 77 A. L. R. 1199, and annotation at p. 1211; 15 Am. Jur., Criminal Law, sec. 519, p. 167; Annotations, 86 A. L. R. 832, 134 A. L. R. 1267; *United States* v. *Lynch* (3 Cir.), 132 F. (2d) 111; *Murphy* v. *State*, 184 Md. 70, 40 A. (2d) 239, 244; *Courtney* v. *State*, 185 Tenn. 247, 205 S. W. (2d) 752; *Hobson* v. *Youell*, 177 Va. 906, 15 S. E. (2d) 76.

In the recent case of *Williams* v. *People of State of New York*, 337 U. S. 241, 69 S. Ct. 1079, 93 L. ed. 1005, the defendant was convicted of first-degree murder, with a recommendation of life imprisonment by the jury; but the trial judge imposed the death sentence, on the basis of additional information obtained through the court's probation department, "and from other sources," considered pursuant to the New York statute requiring the court, before pronouncing sentence, to examine the defendant's previous criminal record and permitting it to seek any information to aid it in determining the proper treatment of the defendant. It was held that this procedure did not violate the due process clause of the 14th Amendment of the United States Constitution, the court saying in part:

"Tribunals passing on the guilt of a defendant always have been hedged in by strict evidentiary procedural limitations. But both before and since the American colonies became a nation, courts in this country and in England

practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law. * * *"

The court there pointed out that in a trial, before verdict the issue is whether the defendant is guilty of the crime of which he is specifically accused, and the rules of evidence are designed to prevent the introduction of collateral issues and to prevent tribunals concerned solely with the issue of guilt of the particular offense from being influenced to convict for that offense by evidence that the defendant had been guilty of other misconduct. But in the matter of sentence the task of the judge, within fixed statutory or constitutional limits, is to determine the type and extent of punishment after the issue of guilt has been determined, to the end that punishment should fit the offender and not merely the crime.

Here, the crime with which the defendant was charged was punishable by death or by confinement in the penitentiary for life or for any term not less than five years, or from one to 20 years in the penitentiary if the prosecutrix consented. His guilt was not denied. At the conclusion of the evidence the only question involved was as to his punishment. Upon this question, and after a judgment of guilty, in order to make the punishment fit the offender and not merely the crime, the court could, independently of statute, inquire into the record of the defendant, whom he was about to sentence, to assist the court in determining the proper punishment to be imposed within the limits fixed by law. *Williams* v. *People of State of New York, supra.*

The effect, therefore, of section 53-278.1[2] was to make mandatory, and to prescribe the method of, a procedure

---

[2] It is to be noted that this section affords the defendant an opportunity to challenge the report of the probation officer and to present additional facts, and thus escapes the criticism which has been made of statutes not including such provisions. See 49 Col. L. Rev. 567.

which prior thereto had been permissive. It was, therefore, a procedural statute and did not violate the constitutional prohibition against *ex post facto* laws when applied in this case. *Gilreath* v. *Commonwealth*, 136 Va. 709, 118 S. E. 100; Code, 1950, sec. 1-4.

The final assignment is that the court referred the case to the probation officer before finding the accused guilty. The statute, *supra*, note 1, provides that the court shall, "before imposing sentence," direct a probation and parole officer to make investigation and report. The time before sentence when such reference is made is not important. What is important is that the accused shall be adjudged guilty only on evidence admissible on that issue, and before the court hears the probation officer's report. The record in this case affirmatively shows that there was an adjudication of guilty before the report of the probation officer was presented to the court and read and explained to the defendant, who, by his counsel, cross-examined the probation officer and offered evidence of his own, whereupon the court sentenced the defendant.

We find no error and the judgment is

*Affirmed.*