Jack F. CLARIDAY, Appellant,

v.

STATE of Tennessee, Appellee.

Court of Criminal Appeals of Tennessee.

Dec. 30, 1976.

Certiorari Denied by Supreme Court April 25, 1977.

E. E. Edwards, III, and Joe P. Binkley, Sr., Nashville, for appellant.

R. A. Ashley, Jr., Atty. Gen., William C. Koch, Jr., Asst. Atty. Gen., Nashville, Aaron Wyckoff and C. Douglas Thoresen, Asst. Dist. Attys. Gen., Nashville, for appellee.

## OPINION

DAUGHTREY, Judge.

The defendant-appellant, Jack F. Clariday, was indicted and convicted for accepting a $2,500.00 bribe while he was a member of the Metropolitan Nashville-Davidson County Council. The jury assessed his sentence at not less nor more than three years incarceration. On appeal the defendant assigns eighteen errors as grounds for seeking reversal of his conviction. Several of these assignments are not fully briefed before this Court, and therefore can afford the defendant no relief. Although those that remain raise several substantial issues for our determination, we find no reversible error and, accordingly, we affirm the judgment entered below.

The act of bribery in this case undoubtedly was precipitated by the existence of a local practice known as "councilmanic courtesy." Under this practice, proposed zoning and sewer ordinance changes were subject

to veto by the council member in whose district the proposed changes would be effected.

An Alabama real estate development company, desiring to construct a shopping center complex in Donelson (Davidson County) Tennessee, determined that it would first be necessary to build a private sewer system in order to secure building permits for the proposed shopping center. Sewer ordinances were subject to Council approval, and two of the developer's employees, Charles Satterfield and Harold Hale, contacted the district Council member—the defendant, Jack F. Clariday— seeking his support for their company's construction plan.

Satterfield first talked to Clariday during the fall of 1972 at the defendant's place of business, his Donelson barber shop. Asked to sponsor the necessary sewer ordinance, Clariday responded, "Well, I can do this, but why the hell should I?" It quickly became apparent that the defendant wanted to relocate his shop in the new complex. This idea was not acceptable to the developers for various reasons, including the relative commercial undesirability of the defendant's type of business and the existence of prior space commitments with other major companies.

After several unfruitful meetings between Satterfield and Clariday, Satterfield introduced the defendant to Hale, who met with Clariday on more than one occasion in a bowling alley located across from the defendant's barber shop. Hale also resisted the defendant's demands to relocate in the new complex. Pressed for favorable action on the sewer ordinance, Clariday finally complained in exasperation, "Why should I [sponsor this bill]? Kroger's making money on this. You're making money on this, but I'm not making a penny on it." To this Hale replied, "What would it take?" The defendant picked up a napkin and wrote "$2,500.00" on it.

Hale and his business associates subsequently conferred over the matter and decided to pay the bribe rather than have the construction project tied up any longer. Pursuant to explicit telephone instructions received from the defendant on November 2, 1972, Hale returned to Nashville and on November 7 went to the law office of one James A. Carney, to whom he delivered an envelope containing twenty-five $100.00 bills. A few days later Carney gave the envelope to Clariday at a Donelson church the two of them regularly attended.

Thereafter Clariday undertook sponsorship of the needed sewer ordinance, although there was an additional period of delay before its ultimate passage. During this time the defendant convinced the shopping center developers to build his new barber shop for him at cost. (It was finally located at one end of the complex, rather than in the main traffic area as Clariday had originally demanded.)

Over a year later Clariday recontacted Hale and returned the $2,500.00, after the Metropolitan Council Ethics Committee had begun hearings concerning the activities of some ten or twelve Council members (including the defendant).

## I. Applicability of T.C.A. § 39–802

■ The defendant was charged and convicted under T.C.A. § 39–802, a statute which was first adopted in 1858,[1] as derived from a similar provision enacted in 1829,[2] and which provides:

Any executive, legislative, or judicial officer who corruptly accepts, or agrees to accept, any gift or gratuity, or thing of value, or any promise to make any gift, or do any act beneficial to such officer, under an agreement or with an understanding that his vote, opinion, or judgment is to be given in any particular manner, or upon any particular side of any question or proceeding which is, or may by law be brought, before him in his official capacity, or that, in such capacity, he is to make any particular appointment, shall, on conviction, be punished by im-

---

1. Code 1858, § 4798.

2. Acts, 1829, Ch. 23, Sec. 44.

prisonment in the penitentiary not less than three (3) years nor more than twenty-one (21) years.

The defendant contends that this provision has no application to the facts alleged in the indictment because of the subsequent enactment[3] of T.C.A. § 39–804, which governs the acceptance of bribes by any "[p]eace officer or as such state, county or municipal employee . . . ."[4] The defendant argues that as a municipal official he is covered exclusively by the terms of the latter statute. We do not agree.

By its plain language § 39–802 applies to "*any* executive, legislative, or judicial officer" (emphasis ours) and prohibits exactly the kind of illegal conduct charged in the indictment in this case, *i. e.*, the acceptance of a gratuity by such official "under an agreement or with an understanding that his vote . . . is to be given in any particular manner . . . ."

By its terms § 39–804 applies to the misconduct of two other principal categories of persons connected with governmental activities, *i. e.* "any police officer or official, sheriff, deputy sheriff, constable, town marshal, game warden, deputy game warden, state highway patrolman or any other state, county, or municipal peace officer, *or* any state, county or municipal employee . . . ." (emphasis ours).[5] It is clear that the defendant falls into neither of the major categories elaborated in § 39–804. If his misconduct is not covered by § 39–802, it

is not proscribed at all. We do not think the legislature intended to create such a gap in the law, and we prefer to give full effect to the plain language of § 39–802.

It follows that the trial judge was correct in overruling the defendant's motion to quash based on this issue, and the related assignment of error must therefore be overruled.

## II. *Pre-trial Publicity*

■ The Metro Council Ethics Committee held hearings during February and March of 1974. The defendant's activities in connection with his successful attempt to relocate his barber shop were among the subjects considered by the Ethics Committee, but there was no investigation into the $2,500.00 bribe for which the defendant was tried in this case.

Clariday was indicted for bribery in May 1974, and his attorney filed a plea in abatement some two months later, in which he alleged that massive pre-trial publicity "generated by the misconduct of the government," *i. e.* the Ethics Committee hearings, had so prejudiced the defendant's case that he was unable to secure a fair and impartial trial. The defendant's request for dismissal of the charge on its merits was predicated on various federal authorities, the most relevant being *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952), and *United States v. Abbott Laboratories*, 369 F.Supp. 1396 (E.D.N.C.1973).[6]

---

3.  Code 1932, § 11084.

4.  "Any of the officers, officials or state, county or municipal employees mentioned in § 39–803 who corruptly accepts, or agrees to accept, any gift, gratuity, or thing of value, or any promise to make any gift or gratuity, for doing any act other than those required by law of him as peace officer or as such state, county or municipal employee, or who refrains or desists from performing any such duty, shall be guilty of a felony and be punished by imprisonment in the penitentiary for no less than two (2) years or more than ten (10) years. In any prosecution under this section or § 39–803, neither the officer, nor the state, county or municipal employee, nor the person offering, giving, promising or receiving the bribe shall be deemed to be an accomplice of the other so as to require corroboration."

5.  The actual list of persons covered by § 39–804 appears in § 39–803, governing the bribery or offer of a bribe to an official, and is incorporated by specific reference in § 39–804. See n. 4, *supra*.

6.  The defendant also relies, apparently by analogy, on *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), in which the United States Supreme Court held that dismissal on the merits is the only constitutionally appropriate remedy for violation of an accused's speedy trial rights. To our knowledge, no such *exclusive* remedy for prejudice engendered by adverse pre-trial publicity has been recognized by any federal or state courts. The usual mode of relief is by change of venue or continuance.

In *Delaney* a subcommittee of the United States House of Representatives held public hearings that involved a defendant awaiting trial on a pending indictment. The First Circuit Court of Appeals indicated that when damaging publicity results from such hearings, the government "may find it necessary to postpone the trial until by lapse of time the danger of prejudice may reasonably be thought to have been substantially removed." *Id.* at 114.

While we do not disagree with the policy expressed in *Delaney*, we think that case is distinguishable from the facts before us: here the subject matter of the hearings was different from the misconduct alleged in the indictment; Clariday was not charged until after the hearings were concluded; and no continuance was sought by the defendant (presumably none was needed) because at the trial some ten months after the conclusion of the hearings, the voir dire of the jury by defense counsel was entirely perfunctory. Furthermore, the record fails to reflect any inordinate difficulty in seating a qualified jury. We note finally that the remedy suggested in *Delaney* is continuance, and not outright dismissal as requested here.

In *Abbott*, the court did order dismissal as a result of adverse pre-trial publicity, because five days before the indictment was handed down, the Food and Drug Administration (at whose request the Justice Department initiated prosecution) disseminated prejudicial information against the defendant. The Court concluded that such an "extreme penalty" was necessary "because the government . . . *solely* generated the prejudicial publicity (emphasis added)." 369 F.Supp. at 1404. Again, the situation here must be distinguished. In the case before us there was a difference in the subject matter investigated by the two bodies (the Ethics Committee and the Grand Jury). Furthermore, the publicity in this case was generated not only by the public hearings, but also by various press confer-

ences and interviews initiated by the defendant and his counsel. The defendant obviously thought that increased publicity would work to his benefit. He cannot now be heard to complain that it did not.

■ Finally, the defendant argues that the State's motion to strike the plea in abatement had the procedural consequence of admitting the truth of all factual allegations in the plea. This is a correct statement of law. *State v. Black*, 524 S.W.2d 913 (Tenn.1975). Applied here, it means that the State admitted the existence of extensive publicity concerning Clariday as a direct result of the Ethics Committee hearings. It does not mean that the defendant's *conclusions* were conceded by the State, e. g. that the State was "guilty of misconduct," or that the publicity made it "impossible for the defendant to receive a fair trial," or that the Grand Jury was "improperly influenced" by the publicity.

The assignment of error attacking the order of the trial court granting the State's motion to strike the defendant's plea in abatement is overruled.

### III.  *Prosecution's Failure to Disclose*

The defendant filed extensive pre-trial discovery and disclosure motions, relying on the existing State statutes[7] and on constitutional guarantees.[8] He complains on appeal that he was not furnished statements made by the defendant to Satterfield and Hale and that the State violated his right to due process in failing to disclose the prior statement of a material witness (Carney) which was inconsistent with his testimony at trial.

■ The statements made by the defendant to the two witnesses for the State are plainly outside the purview of T.C.A. § 40–2441, which limits discovery of an accused's statements to those "made before any law enforcement officer or agency . . . ." Although Hale later cooperated with the State and was given immunity from prose-

---

7.  See T.C.A. § 40–2044 and § 40–2441.

8.  See *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Branch v. State*, 4 Tenn.Cr.App. 164, 469 S.W.2d 533 (1970).

cution in exchange for his testimony against Clariday, he certainly was in no sense an agent of the State at the time the undisclosed statements were made.[9] We therefore find no violation of T.C.A. § 40–2441. The defendant's reliance on *State v. Gaddis*, 530 S.W.2d 64 (Tenn.1975) is misplaced. *Gaddis* relates to the substantially broader provisions of T.C.A. § 40–2044, governing inspection of tangible evidence, and by its own terms cannot be retroactively applied to the case before us.

■ The purported inconsistent statement by the witness Carney was not made a part of the record on appeal ·and is not properly before us for review.

The assignments related to non-disclosure are overruled.

### IV. *Applicability of the Best Evidence Rule*

According to Hale's testimony, after the defendant wrote the figures $2,500.00 on a napkin, the napkin "was discarded by either Mr. Clariday or myself, I don't know (whom)." He further testified that it was not presently in his possession.

■ The defendant objected to the introduction of this testimony on the grounds that it constituted hearsay [10] and that it was inadmissible unless the original napkin was produced in court. He now argues that because the napkin may have been destroyed at the hands of the proponent, oral testimony as to its content must be excluded by operation of the best evidence rule. We do not agree.

In the first place, it is far from clear that the rule ought to be applied in these circumstances. The transaction here was conversational in nature, and what is relevant is not the "document" itself, but the fact that it was "executed." See McCormick, *Evidence* § 233 (2d ed. 1972). The napkin in question also bears close resemblance to an inscribed chattel, to which the production-of-documents rule is applied on a discretionary basis "in light of such factors as the need for precise information as to the exact inscription, the ease or difficulty of production, and the simplicity or complexity of the inscription." *Id.* at § 232.

■ Even if the best evidence rule is applicable here, it must be remembered that the rule is one of preference rather than exclusion. Thus, in an instance involving loss or destruction of a document relevant to the issues being litigated, "if as a practical matter the document cannot be produced . . . , the production of the original is excused and other evidence of its contents becomes admissible." *Id.* at § 237.

■ There was no dispute at trial as to the non-existence of the original writing, but the defendant objected to the proponent's offer of oral testimony on the ground that because the original was destroyed by the proponent,[11] secondary evidence of its content was inadmissible. However, this result would follow only if the proponent were unable to show "that the destruction was accidental or was done in good faith, without intention to prevent its use as evidence. . . ." *Id.*

The record before us fails to raise any inference of fraud. Furthermore, the writ-

---

**9.** The State did furnish the defendant with a transcription of a telephone conversation between Hale and Clariday that occurred after Hale was interviewed by the State prosecutor and investigator. See Section V, *infra*.

**10.** The defendant has failed to brief the hearsay question presented. We conclude that the testimony does not involve hearsay, because the evidence was offered not to prove the truth of the matter recorded, but only that the event in fact occurred. It is in the nature of a verbal act. See McCormick, *Evidence* § 249 (2d ed. 1972). But the question is academic, because even if the evidence were viewed as hearsay, it

comes within a well-recognized exception to the rule against hearsay: admissions of a party-opponent. See McCormick, *supra*, § 262.

**11.** The State responds that the "proponent" of this evidence is the State rather than the witness Hale, and that Hale's failure to preserve the napkin is not attributable to the State. This argument is not unreasonable, but we think it is unnecessary to decide this point. The evidence fails to show conclusively who actually disposed of the napkin; it also fails to indicate any fraud in the loss of this evidence.

ing itself was uncomplicated and there is no suggestion of testimonial mistransmission of its content. The defendant does not contest the accuracy of the witness's testimony concerning what was inscribed on the napkin. Instead he wishes by means of the best evidence rule to bar introduction of testimony concerning what was written on the napkin, arguing that the napkin itself may never have existed nor the event ever transpired. As we have noted previously, the function of the rule is not to exclude documentary evidence, but only to require production of the best available form of that evidence. Once the secondary evidence had been admitted, the defendant was free to use all regularly available methods to impeach the testimony of the witness as to the occurrence or non-occurrence of the event itself, *i. e.* the defendant's act of inscription on the napkin.

The trial court committed no error in allowing introduction of this evidence. The related assignment of error is overruled.

## V. *Admissibility of Tape Recording*

■ On March 20, 1974, just after the conclusion of the Ethics Committee hearings and after the Tennessee Bureau of Investigation had conducted interviews of Satterfield and Hale, but two months prior to the defendant's indictment and arrest, Clariday called Hale at Hale's home in Alabama, apparently to determine whether Hale had talked to the authorities in Nashville about the $2,500.00 bribe. The conversation was recorded by a device which the T.B.I. had attached to Hale's telephone with his knowledge and consent. Both the tape and a written transcription were introduced into evidence over the defendant's two-pronged objection: first, that the conversation was irrelevant; and second, that it violated his rights under the Fourth, Fifth, and Sixth Amendments to the United States Constitution, as well as his parallel rights under the Tennessee Constitution.

The conversation between Clariday and Hale was short and to the point:

"Hale: Hello.
Clariday: Is Hale there?

Hale: This is he.
Clariday: Hale, this is Jack Clariday.
Hale: Yes.
Clariday: Did you talk to the grand jury or the District Attorney?
Hale: I didn't talk to the Grand Jury. The assistant district attorney called me up, and I came to Nashville last week.
Clariday: What, did you tell him the whole story?
Hale: Just like I told you, I just told him what happened. Not to go into real detail about it.
Clariday: Did you tell him that I paid you back?
Hale: Yeah, and that . . . that came out.
Clariday: When did you, I mean, what I am trying to find out what position I am in . . . Did you tell him I paid you back, when I did or before I did or when?
Hale: I just, ah, I told him you paid me back, the date you paid me back, right, that came out.
Clariday: You mean the other day?
Hale: Yeah, uh huh, or whenever it was, two or three weeks ago.
Clariday: I guess they are going to put me in the penitentiary then.
Hale: They had me . . . ah . . threatened me with an indictment, ah, and I had to go.
Clariday: How did they find out about your deal, I mean about you?
Hale: I don't know. They knew a lot of stuff that surprised me that I didn't. I don't know how they found out, Jack, but they called me up and called my attorney and said, you know, unless you get to Tennessee that it was going to be the federal boys down on me.
Clariday: On this?
Hale: Yeah, and ah, when I got there they said they could have indicted me and again that was something that they were pushing hard to get and . . . . .
Clariday: Well, did they offer you immunity to talk to them?

Hale: Yeah, ah, I would have to say that.

Clariday: I am sorry that it all happened, but it did and I don't know where we will go from here. I guess they'll just burn me.

Hale: I don't know Jack. It was more serious than I thought . . . and maybe, like I say, I don't know what all is going on up there. I don't keep up close contact with it but it's a problem.

Clariday: I'll . . . I'll just have to suffer it out I guess.

(Operator signals end of initial period)

Clariday: I'll see you then, Hale.

Hale: O.K.

Clariday: Bye-Bye.

Hale: Bye."

The defendant's contention that this conversation is irrelevant because it represents "no more than the statement of a dejected man" who has "no confidence that he will be treated fairly" must be rejected out of hand. We agree that many of the statements made during the conversation were prejudicial to the defendant's case. So are most admissions against interest offered by a party-opponent at trial. But we know of no established rule of evidence which would prevent the introduction of these otherwise relevant statements. Not only do the statements tend to show a consciousness of guilt on Clariday's part, but the reference to his return of money to Hale tends to prove that he accepted money from Hale in the first place. We conclude that the taped conversation is not subject to attack on the basis of its probative value.

■ The testimony complained of tend-constitutional error in the introduction of the tape. The circumstances of the conversation bear strong resemblance to the facts in *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). There the government informer was a personal confidant of Hoffa's and was secretly reporting to government officials statements made by Hoffa both to him and to others within his hearing. The United States Supreme Court found no constitutional violations under the Fourth, Fifth, or Sixth Amendments.

As to the defendant's contention related to the Fourth Amendment's protection against unreasonable search and seizure, the *Hoffa* court held that the informer's presence did not constitute unwarranted government intrusion, that he was in Hoffa's hotel suite by invitation, and that, vis-a-vis the informer, Hoffa had "no interest legitimately protected by the Fourth Amendment" because "[he] was not relying on the security of the hotel room" but "upon his misplaced confidence that Partin (the informer) would not reveal his wrongdoing." *Id.* at 302, 87 S.Ct. at 413.

If, under the authority of *Hoffa*, Hale could testify to his conversation with Clariday, we see little practical merit in holding that the same conversation could not be recorded and the tape played before the jury, so long as the existence of the recording device was known to one of the parties to the conversation. A plurality of the United States Supreme Court has so held, despite the post-*Hoffa* case of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), in which the Court outlawed indiscriminate electronic surveillance in the absence of an authorizing warrant. Writing for the Court in *United States v. White*, Justice White noted:

> If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversations which are later offered in evidence to prove the State's case. 401 U.S. 745, 752, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (1971) (plurality opinion).

See also *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *United States v. Dowdy*, 479 F.2d 213, 229 (4th Cir.), *cert. denied* 414 U.S. 823, 94 S.Ct. 124, 38 L.Ed.2d 56 (1973), *United States v. Puchi*, 441 F.2d 697 (9th Cir. 1971); *cf. Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966).

The *White* plurality's "assumption of risk" analysis has been subjected to criticism by both the courts and the commenta-

tors.[12] See *e. g., People v. Beavers*, 393 Mich. 554, 227 N.W.2d 511 (1975) (position taken by Harlan, J., dissenting in *White*, adopted by 6–1 majority); Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L.Rev. 349, 406–07 (1974). But without regard to the soundness of that theory, we think the facts here can be distinguished from those in the usual "bugged" agent situation (typified in *White*) so as to escape further constitutional criticism: in the case before us the defendant was dealing not with a *secret* agent, but with someone who told him immediately and unequivocally, at the very beginning of the telephone conversation, that he had become, in effect, an informer for the State. Under these circumstances, we think the defendant made his remarks at his own risk, and, like the *White* plurality, we are unable to see how the recording of those statements makes any significant, practical or constitutional difference in the result. We agree with Justice White's conclusion that "[g]iven the possibility or probability that one of his colleagues is cooperating with the police, it is only speculation to assert that the defendant's utterances would be substantially different or his sense of security any less if he also thought it possible that the suspected colleague is wired for sound." 401 U.S. at 752, 91 S.Ct. at 1126.

Nor do we think that evidence of the taped conversation violated the defendant's privilege against self-incrimination. This same question was addressed in *Hoffa* ; there the Court rejected the defendant's Fifth Amendment claim because his statements to the undercover agents were voluntary and because the facts showed no governmental intrusion. 385 U.S. at 303–04, 87 S.Ct. 408. These conclusions are equally applicable to the facts here. As this court has recently observed, "[w]hile the Fifth Amendment . . . protects one against compulsory furnishing of evidence against oneself, it does not extend to non-privileged communications to third parties." *Sheets v. Hathcock*, 528 S.W.2d 47, 50 (Tenn.Cr.App.1975). Accord, *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973). Although the third party here was a government informer at the time of the conversation, the defendant was not in custody nor subject to interrogation. Thus the *Miranda* requirements do not apply.[13]

Finally, we note that the defendant's Sixth Amendment claim in this context is virtually the same as that raised and rejected in *Hoffa*. There the Court held that nothing in previous Supreme Court rulings mandated the right to counsel prior to arrest, and that "[t]here is no constitutional right to be arrested." 385 U.S. at 310, 87 S.Ct. at 417. Thus, under the Sixth Amendment, a criminal defendant has the right to the guiding hand of counsel during every critical stage of a criminal proceeding, once it has been formally commenced by arrest or indictment, but he or she has no right to counsel during police investigation or surveillance prior to the initiation of "adversary judicial proceedings." *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

We therefore hold that introduction of the recorded conversation violated no constitutional rights of the defendant and we overrule the assignment of error relating to this question.

### VI. *Order of Presentation at Trial*

The defendant next complains that the court committed error in allowing the State to recall a witness in rebuttal for the sole purpose of redeeming the testimony she gave during direct examination. The witness was a telephone company official who testified that a certain call was made from a specific business at a specific time. When the defense proved that the business establishment in question was closed at the time of the alleged call, the court allowed the State to recall the witness to correct her

---

**12.** Significantly, none of the dissenters in *White* specifically questioned the status of *Hoffa*.

**13.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

testimony—she testified that she had misread the telephone number in the company records by one digit.

We are not convinced by the defendant's argument that this constituted an abuse of discretion on the ground that it somehow made the defendant's efforts to impeach the witness look "underhanded." The assignment is therefore overruled.

The defendant also challenges the trial court's decision to allow the State to reopen its case, another area of trial procedure which clearly falls within the trial judge's discretion. When the State closed its case in chief late one afternoon, the trial judge apparently adjourned court despite the defendant's desire to enter a motion for a directed verdict of not guilty.[14] The next morning the State was allowed to reopen its case over the defendant's objection that the State had failed to prove venue prior to resting its case, that the defendant had sought to have a verdict of not guilty directed on this basis on the previous afternoon, and that his challenge to the State's case on this basis would be improperly thwarted if the State were belatedly allowed to prove venue. His objection was overruled.

The State then called James Carney, the intermediary in the delivery of the $2,500.00 from Hale to Clariday. On the previous day this witness had testified that he received the funds from Hale in his law office located in Nashville, Davidson County, and that within a few days he turned over the envelope to Clariday "on church grounds outside the church building on Lakeland and McGavock." Upon recall the next day the witness was asked if the church was located in Davidson County, Tennessee, and he responded affirmatively. The defendant contended, and continues to do so, that in the absence of this latter piece of testimony, the record fails to establish venue in Davidson County. We disagree.

There can be no dispute that Carney was acting as Clariday's agent in the transmission of these funds, whether or not Carney realized this at the time he received the envelope containing the bribe money. While we agree with the proposition espoused by the defendant that venue for accepting a bribe lies only in the county where the bribe was accepted, we see no reason not to extend this rule to cover the locus of a constructive acceptance, in light of the fact that there is no dispute that the money received by the defendant's agent was subsequently turned over to the defendant. This being true, we think that the bribe was constructively in Clariday's possession from the moment it was received by Carney, acting as his designated agent. Furthermore, the trial court could have taken judicial notice that the intersection of Lakeland Drive and McGavock Pike lies within the boundaries of Davidson County. *White v. State,* 540 S.W.2d 287, 289 (Tenn. Cr.App.1976).

We therefore conclude that venue had been established at the time the State closed its case, and that a reopening was unnecessary for this purpose. In reaching this conclusion we are mindful that venue is a jurisdictional requisite under Tennessee law and cannot be waived by going to trial on the merits of the case. Nevertheless, it is also true that venue is provable merely by a preponderance of the evidence, and we do not think the same legal niceties must be applied in proving venue as are required to establish the existence of an essential element of the offense charged.

Moreover, we hold that the trial court's action in permitting the State to reopen its case was not an abuse of discretion under these facts. Under Tennessee law a judge has the discretion to permit the introduction of further evidence even after a party has moved for a directed verdict. *Boone v. Citizens' Bank & Trust Co.,* 154

---

14. No effort to make such a motion appears in the bill of exceptions until the following morning. However, at that time the State did not contest defense counsel's assertion that he had tried to make his motion the evening before and was prevented from doing so by a specific ruling of the court.

Tenn. 241, 290 S.W. 39 (1927); *Kelley v. Brading*, 47 Tenn.App. 223, 337 S.W.2d 471 (1960). Courts in other states have recognized this rule and have applied it to criminal cases in which the State has been permitted to reopen its case for the purpose of establishing venue. *McClain v. Commonwealth*, 189 Va. 847, 55 S.E.2d 49 (1949); *People v. Eger*, 299 Mich. 49, 299 N.W. 803 (1941); *Alstott v. State*, 205 Ind. 92, 185 N.E. 896 (1933).

In the absence of any manifest injustice, the trial court's exercise of discretion here must be upheld. *Higgins v. Steide*, 47 Tenn.App. 42, 335 S.W.2d 533 (1959). The assignment of error is therefore overruled.

### VII. *Trial Court's Failure to Direct the Verdict*

The defendant presents several legal and factual bases on which he contends the trial judge should have directed a verdict of not guilty. We have examined them all, and we find as to each of the grounds that the facts adduced at trial made out a prima facie case for the jury's determination.

One additional legal ground is put forward, that the trial court should have directed a verdict of not guilty on the basis of the controversy surrounding the question of venue. We think this contention is legally unmeritorious. See Section VI, *supra*. Accordingly, we overrule all those assignments related to the court's refusal to direct a verdict in the defendant's favor.

### VIII. *Qualification of the Jury Foreman*

Some time shortly after the verdict was returned, the defendant's attorneys discovered that the jury foreman was a part-time student at Nashville's YMCA (night) Law School, where he was enrolled in a criminal law class taught by District Attorney General Thomas H. Shriver, the chief prosecuting officer in the county in which the trial occurred. Although Shriver's signature appeared on the indictment (which was read to the jury at the commencement of trial), he did not participate in any phase of the actual trial of the case. Nevertheless, the defendant insists that the juror in question was unqualified to sit on the jury and that his failure to disclose his relationship with the district attorney deprived defense counsel of the intelligent exercise of peremptory challenges in the defendant's behalf.

There is no evidence in the record to suggest that the law student-juror answered any question falsely or withheld requested information. Furthermore, questions addressed by the defense to the prospective jurors can only be described as perfunctory.[15] (They were also surprisingly few in number, given the defendant's previous complaint concerning the amount of publicity which preceded the trial. See Section II, *supra*.) In the absence of questions calculated to produce specific answers, we think the defendant waived his right to object to a juror's failure to volunteer what could reasonably be interpreted as extraneous information. *Monday v. State,* 160 Tenn. 258, 23 S.W.2d 656 (1930).

The defendant next argues that in the circumstances of this case the undisclosed relationship of teacher-student in effect disqualifies the juror per se, under the authority of *Toombs v. State,* 197 Tenn. 229, 270 S.W.2d 649 (1954). In *Toombs* the Tennessee Supreme Court held that a kindred relationship and close friendship of a juror who was a first cousin of the prosecuting witness's wife should have been re-

15. During voir dire for the defendant, defense counsel discussed the concept of reasonable doubt, informed the jury that the defendant sought only a fair trial, and asked if the relative position of the defendant and the prosecuting witness would prevent any of the prospective jurors from giving the defendant a fair trial. After receiving no reply, defense counsel immediately accepted the jury. The only specific individual questions put by the defense were aimed at a prospective alternate, who was not seated. The jurors were asked their "occupations" by the prosecutors, to which the juror in question answered, apparently truthfully, that he was on the administrative faculty at Meharry Medical School. The trial judge asked if any of the jurors had been represented by any of the four lawyers in the case, two assistant district attorneys and two defense attorneys. Shriver, as noted, was not among the four.

vealed by the juror when he was asked if he knew of any reason why he could not give all parties a fair trial. The Court said that the juror's "failure in this respect justifies the conclusion that he had a purpose unfavorable to [the defendants] in withholding that information. . . ." *Id.* at 651. Therefore the Court found a disqualification *propter affectum, i. e.* one based on the bias or partiality of the juror (as opposed to a disqualification *propter defectum,* arising from requirements relating to age, residency, physical or mental disability, relationship, etc.).[16] As a result, the *Toombs* Court held that the defendants were entitled to a new trial despite the failure of the defense attorneys to inquire specifically into the relationship between the prospective jurors and the prosecuting witness.

We are urged by the defendant to extend the rule of *Toombs* to the facts before us. We decline to do so. The distinguishing factors between the two cases are too obvious to require detailed analysis. Moreover, at least one Tennessee court has previously determined that the existence of a teacher-pupil relationship between attorney and juror does not give rise to an inherently prejudicial situation. *Sears v. Lewis,* 49 Tenn.App. 631, 357 S.W.2d 839, 842 (1961). Furthermore, there was *no* proof offered at the hearing on the motion for a new trial, either by way of affidavit or by oral testimony, to show any improper influence on the verdict by the juror in question. Under such circumstances, we find that the defendant has failed to discharge his burden of showing a prima facie case of bias or favor. *Durham v. State,* 182 Tenn. 577, 188 S.W.2d 555 (1945).

Since we hold that the juror was not legally disqualified, and there being no evidence in the record showing actual favor or partiality affecting the outcome of the trial, we overrule the assignment of error related to this issue.

We can find no error in the record which would require reversal of this conviction. The judgment of the trial court is therefore affirmed.

RUSSELL and GALBREATH, JJ., concur.

---

16. Such bases for disqualification are deemed ·waived once the jury is sworn. *Durham v.*

GALBREATH, Judge, concurring.

While concurring without reservation in Judge Daughtrey's opinion I would follow precedent laid down by such humane jurists as Mr. Justice Cook in *Woodruff v. State,* 164 Tenn. 530, 51 S.W.2d 843 (1932), and urge that clemency, if appropriate, be extended if application is made on behalf of the defendant, whom I regard as a product of the same misguided but all too often tolerated approach to public service that resulted in the prosecutions of and clemency bestowed upon such political figures as a former President and Vice-President of the United States.

Hopefully, the painful lessons of recent years that have forcibly taught those entrusted with public office that they, even more than others, should refrain from violation of law, will be effective. It is doubtful if any useful purpose to society will be served by incarcerating any first offenders in this category, if it is made to appear that the chances of them again engaging in improper conduct is remote and that the chances for complete rehabilitation are promising. The deterrent effects of the ordeal inherent in the publicity surrounding the prosecution is probably much more effective than would be punishment and in illustrating graphically that, in our society, no person is above the law.

*State,* 182 Tenn. 577, 188 S.W.2d 555, 557 (1945).