IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 25, 2023

## STATE OF TENNESSEE v. ROGER DEAN GUIN

**Appeal from the Criminal Court for Knox County**
**No. 118055    Scott Green, Judge**

---

### No. E2022-00391-CCA-R3-CD

---

The defendant, Roger Dean Guin, appeals his Knox County Criminal Court jury convictions of aggravated sexual battery, rape of a child, assault, rape, incest, and sexual battery by an authority figure, arguing that the trial court erred by denying his motion to suppress his statement and that the evidence was insufficient to support his convictions. Because the State's elections in Counts 8, 9, and 10 were insufficient to protect the defendant's right to a unanimous jury verdict and to protect against violations of the principles of double jeopardy, we vacate those convictions and remand for a new trial on those counts. We also remand the case to the trial court for entry of corrected judgments in Counts 3, 5, and 7 reflecting the merger of those convictions into Counts 2, 4, and 6 respectively and reflecting the proper misdemeanor classification and sentences. We reverse the conviction in Count 1 and affirm the trial court's judgments in all other respects.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Vacated and Remanded in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER, and TOM GREENHOLTZ, JJ., joined.

J. Liddell Kirk, Madisonville, Tennessee (on appeal), and Robin Vargas, Blaine, Tennessee (at trial), for the appellant, Roger Dean Guin.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Charme P. Allen, District Attorney General; and Rachel Lambert and Jordan Murray, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Knox County Grand Jury charged the defendant by presentment with one count of aggravated sexual battery, two counts of rape of a child, two counts of rape,

one count of sexual battery by an authority figure, and four counts of incest.

At the November 2021 trial, the victim, who was 18 at the time of trial, testified that she was born on June 19, 2003. She said that in 2013, the defendant, who was dating the victim's mother at the time, moved into the Knoxville home that the victim shared with her mother and siblings. The victim's mother and the defendant married in 2017, and the defendant moved out of the home sometime around the "end of 2018, beginning of 2019." The victim said that the defendant had a position of authority over her and her siblings with their being expected to obey him and his being permitted to discipline them. She said that the defendant "was a lot nicer to me" than to her siblings and "would always kiss me and hug me." The victim said that after the defendant moved in, her mother had to "restart her chemo[therapy] treatment" for leukemia, which treatments caused her to "[]sleep a lot of the time."

The victim recalled an occasion sometime during 2013, in which her "whole family was in the living room watching a movie" when the defendant began "scratching my back." He told her "that my skin was soft. And then proceeded to put his hands around my waistband and touched my butt" inside her clothing. During a second incident also in 2013, the victim was in her bedroom ("bedroom 1") that she shared with her two sisters when the defendant "came in and put his hands" "inside" her "vaginal area." The victim said that she moved into another bedroom ("bedroom 2") in the house in 2015, and the defendant came into that room and touched her in the same way that he did in [bedroom 1]." The victim said that the defendant repeated this conduct "[a]lmost every night" while the defendant lived in the home and while the victim was ages 10 through 15.

The victim recalled an occasion in which the victim accompanied the defendant in the car "to get food" when the defendant "put his hand on my thigh and told me . . . that if I had told anybody, we would get in trouble." The victim understood him to mean his "[t]ouching my vaginal area." The victim said that "generally," the defendant touched her vaginal area and other parts of her body over her clothing "anywhere" in the house, including "the living room." When asked whether this conduct occurred when she was younger than or older than 13 years old, the victim replied, "I'd say both."

On another occasion, the victim was up at night caring for her mother who was sleeping after a chemotherapy treatment when the defendant, who "had gotten drunk," told her to go to another room in the house. She went to the room that was a guest room at the time ("bedroom 3") and "laid on the bed about to go to sleep" when the defendant "had come in there with just his boxers on and a beer and . . . his phone in his hand." The defendant "started touching me" and put his penis in her "vaginal area," which she said "hurt." The victim could not remember exactly when this incident occurred but estimated

that it was approximately two years before the defendant moved out in 2018, when the victim was somewhere between the ages of 13 through 15. She also said that bedroom 3 had been her brother's room before he moved out at age 18. She said that she was four years younger than her brother.

The victim said that she did not report any of these incidents because she was scared of the defendant, she had seen him be physically violent with her mother, and the defendant had said that there would be bad consequences if she called the police about the violence. The victim said that when she was a junior in high school, she told her boyfriend about the defendant's sexual abuse, and her boyfriend reported it to the police. When the police came to her home to investigate, she disclosed the abuse and also reported it in a recorded interview with the Department of Children's Services ("DCS").

During cross-examination, the victim acknowledged that during an interview with DCS in 2018, she denied having been touched sexually. She said that she did not disclose the abuse at that time because the defendant drove her to DCS that day and had told her, "Make sure not to say something." The victim also said that she had "been through DCS up and down" and neither liked nor trusted them.

The parties stipulated to the fact that when the victim spoke with the police at her home, she alleged that the abuse "had been ongoing for some period of time" and that there "had been multiple instances." The victim's statement "was not limited to just saying that [the abuse] happened in 2018."

During redirect examination, the victim testified that she had undergone more than one forensic interview at the Childhelp facility coordinated by DCS. She acknowledged that she had been the victim of a separate sexual assault allegation involving someone other than the defendant. She said that during the forensic interview about that separate allegation, she denied any sexual abuse despite the abuse by the defendant being ongoing at that time. The victim reiterated that she "was scared" and that the defendant was still living with her family at that time and had "told me not to say anything about him."

Lieutenant Miranda Spangler testified that she worked in the family crimes unit at the Knox County Sheriff's Office ("KCSO"). She testified that she investigated this case and reviewed the victim's recorded forensic interview in which the victim disclosed the defendant's abuse. Lieutenant Spangler arranged for the victim's mother to place a recorded telephone call to the defendant. She said that it was her practice to talk with the person who was going to place the call about "what we're going to ask and what we need to know" from the defendant. The call was placed from Lieutenant Spangler's office. The

jury heard the recorded telephone call between the victim's mother and the defendant.

In that call, the victim's mother asked the defendant, "Did you ever do anything inappropriate with [the victim]?" At first the defendant admitted to hugging the victim and "rubb[ing] her back." Although the defendant was silent through much of the conversation, he ultimately admitted to having "touched" the victim. He also admitted that on one occasion, he entered a room with the victim, pulled down his boxers, pulled down the victim's pants, and had sex with the victim. The defendant told the victim's mother, "I guess I should have came to you when she wanted attention."

Lieutenant Spangler acknowledged that she could be heard whispering on the recording and said that she was directing the victim's mother on follow-up questions and what information she needed to obtain.

During cross-examination, Lieutenant Spangler acknowledged that she did not interview the victim's boyfriend but explained that the victim disclosed the abuse to him over a text message and did not deem it necessary to obtain a statement from him. She said that she did not collect evidence from inside the house because the abuse had occurred approximately one-and-a-half to two years prior to when she began her investigation. She acknowledged that she did not interview any of the victim's siblings or investigate the victim's mother's medical records for her chemotherapy dates to try to determine more-specific dates of when the incidents of abuse occurred.

On redirect examination, Lieutenant Spangler said that she was not the initial investigator on this case and that she got the case from Kenneth Aiken. As part of the investigation, she extracted data from the victim's cellular telephone.

The State rested.

After a *Momon* colloquy, the defendant elected neither to testify nor put on any proof.

On this evidence, the jury convicted the defendant of one count of aggravated sexual battery, two counts of rape of a child, two counts of rape, one count of sexual battery by an authority figure, and one count of incest as charged in Count 9. As to the remaining three incest charges in Counts 3, 5, and 7, the jury convicted the defendant of the lesser included offenses of assault. After a sentencing hearing, the trial court sentenced the defendant to an effective sentence of 40 years.

Following a timely but unsuccessful motion for a new trial, the defendant

-4-

filed a notice of appeal.[1]  In this appeal, the defendant argues that the trial court erred by denying his motion to suppress his statement made to the victim's mother and that the evidence is insufficient to support the convictions.  Upon our order for supplemental briefing, the defendant also argues that the State's elections of offenses were inadequate to protect his right to a unanimous jury verdict and to protect against a violation of the principles of double jeopardy.  He also argues that his assault convictions in Counts 3, 5, and 7 violate the principles of double jeopardy.

## *I.  Motion to Suppress*

Before trial, the defendant moved to suppress a statement that he made to the victim's mother during a telephone call that was being recorded by law enforcement, arguing that his statement was involuntary because the victim's mother, acting as an agent of the State, was overly coercive.  The defendant argued only that the statement was obtained in violation of his Fifth Amendment privilege against self-incrimination; he did not raise a Sixth Amendment claim of a violation of his right to counsel or that he was entitled to *Miranda* warnings.

During a hearing on the motion to suppress, Lieutenant Spangler testified that as a detective with the family crimes unit of the KCSO, it was a common practice for her to attempt to get recorded statements from suspects.  In this case, Lieutenant Spangler had the victim's mother place a recorded telephone call to the defendant.  She said that before the call, she discussed with the victim's mother "how she would start the conversation and kind of where we wanted to go with the conversation."  She told the victim's mother that the conversation should be about "trying to get help for her daughter" and her "want[ing] to know the truth so that she could get her counseling help, whatever she needed to do for her."  Lieutenant Spangler told the victim's mother that "we don't threaten, we don't make promises, we don't do anything like that."  The call was placed from the lieutenant's office, and Lieutenant Spangler and another detective were present during the call.  The defendant did not answer the first call, and the victim's mother "left a message."  When the defendant called back, the entirety of the conversation was recorded.  Lieutenant Spangler said that during the call, the defendant "admitted to touching the victim and having sex with her."  Lieutenant Spangler said that during the call, the victim's mother made no threats or promises and told the defendant that she wanted to know what had happened so that she could get help for the victim.  She also said that nothing prevented the defendant from terminating the call.

---

[1]  We note that the defendant's notice of appeal was late by two days, being due on March 28, 2022.  However, because the State does not address the untimeliness of the notice of appeal and because appellate counsel was appointed less than two weeks before the notice of appeal was due, we waive the timely filing requirement in the interests of justice.  *See* Tenn. R. App. P. 4(a).

In the recorded telephone call, after the victim's mother asked whether the defendant had done "anything inappropriate" with the victim, she told him, "I'm not doing this to try to get you in trouble." She also said, "I need to know what happened so that I can talk to [the victim] about it and I can work with her on this and get through this. Otherwise, I'm going to send her to a counselor and let the counselor deal with it and then whatever happens, happens." When the defendant would not answer the victim's mother's questions, she said, "By law, if I send her to a counselor, they have to tell what she tells. And the amount of stuff she's told me, I promise you'd get in a lot of trouble if anybody else finds out." After a period of silence by the defendant, the victim's mother said, "Answer the question. Because I don't think you'd like for people to be showing up at your dad's house and getting your dad all upset about it, would ya? . . . So, you and I talk about it or it's going to be worse and the whole damn world's going to end up knowing about it." After another period of silence, she said, "Ok, I guess I'll have to call your dad then, huh?" After yet another period of silence by the defendant, the victim's mother said, "How do you think Kathy would feel if she ever found out about this? You think she'd let you see your kids anymore?" And later, "Do we need to end our phone call and I can call Kathy?" Several times during the conversation, the defendant asked if he could call back later, but the victim's mother told him no.

During cross-examination, Lieutenant Spangler acknowledged that during the telephone conversation, the victim's mother led the defendant to believe that she was at home. She said that prior to the call, she and the victim's mother "had a roleplay of how she would start the conversation" but that "[m]ost of the stuff that she said, I did not instruct her to say." She instructed the victim's mother to "start the conversation however you want to, but let's start it as . . . we need to talk, and we need to talk about how to help [the victim]." She told the victim's mother "to put everything in her words." During the call, Lieutenant Spangler "wr[o]te down questions to get her back on track" when the conversation "start[ed] straying away from what we're trying to achieve." Lieutenant Spangler said that the victim's mother repeatedly told the defendant not to hang up but reiterated that he could have done so at any time. Lieutenant Spangler acknowledged that she could be heard whispering on the recording, "Get him to say how old she was when they had sex." She said that she also wrote down questions during the conversation that the victim's mother should ask.

On redirect examination, Lieutenant Spangler said that she directed the victim's mother on "[v]ery little" of the 48-minute conversation.

In its written order denying the defendant's motion to suppress, the trial court concluded that the defendant's statement was voluntary. In this appeal, the

-6-

defendant reasserts his argument that his statement was involuntary because the victim's mother was overly coercive.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

As an initial matter, we note that the defendant failed to raise the issue of suppression in his motion for new trial, and accordingly, he has waived our plenary review of the issue. *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.").

Whether properly assigned or not, however, this court may, "[w]hen necessary to do substantial justice, . . . consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial." Tenn. R. App. P. 36(b). This court will grant relief for plain error only when:

> (1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake; that is, the error was so significant that it "probably changed the outcome of the trial."

*State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (quoting *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000)). The party claiming plain error bears the burden of satisfying all five criteria as a prerequisite to plain error review. *See id.* Because each factor must be established, we need not consider all five factors when a single factor indicates that relief is not warranted. *State v. Fayne*, 451 S.W.3d 362, 372 (Tenn. 2014) (citing *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007)). "[A]n error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to

rise to the level of plain error." *Fayne*, 451 S.W.3d at 372 (citation omitted) (alterations in *Fayne*).

Here, the trial court's admission of the statement did not breach a clear and unequivocal rule of law. Generally, "the law provides no protection to a suspect or a defendant whose trusted . . . confidant 'has recorded or transmitted the conversations which are later offered in evidence to prove the State's case.'" *State v. Sanders*, 452 S.W.3d 300, 314 (Tenn. 2014) (quoting *Clariday v. State*, 552 S.W.2d 759, 768 (Tenn. Crim. App. 1976)). In our view, the secretly recorded telephone call placed by the defendant's wife was not so deceptive as to overbear the defendant's will and render his confession involuntary.[2] *See State v. Pate*, No. M2009-02321-CCA-R3-CD, 2011 WL 6935329, at *9-10 (Tenn. Crim. App., Nashville, Nov. 22, 2011) (citing *State v. Robert Bacon*, No. 03C01-9608-CR-00308, 1998 WL 6925, at *12 (Tenn. Crim. App., Knoxville, Jan. 8, 1998); *State v. Branam*, 855 S.W.2d 563, 568-69 (Tenn. 1993)). Consequently, the defendant is not entitled to relief on this issue.

## II. Election of Offenses

Within the defendant's challenge to the sufficiency of the evidence, we perceive two related issues: (1) whether the State's election of offenses was sufficient to protect the defendant's state constitutional right to a unanimous jury verdict and (2) whether the defendant's convictions of assault in Counts 3, 5, and 7 violate the defendant's state and federal constitutional protections against double jeopardy. The parties did not raise these issues, and we ordered supplemental briefing to allow the parties an opportunity to be heard on these matters. *See State v. Bristol*, 654 S.W.3d 917, 927 (Tenn. 2022) ("[W]hen an appellate court considers an issue that has not been properly presented, it must give the parties 'fair notice and an opportunity to be heard on the dispositive issues.'" (quoting *State v. Harbison*, 539 S.W.3d 149, 165 (Tenn. 2018)).

In supplemental briefing, the defendant argues that the State failed to adequately elect offenses to ensure the defendant's right to a unanimous jury verdict as to all counts and that the convictions in Counts 3, 5, and 7 should be dismissed for violation of the principles of double jeopardy. The State contends that its election of offenses was

---

[2] We need not reach the question whether the defendant's wife was acting as an agent of the State. *See State v. Willis*, 496 S.W.3d 653, 698 (Tenn. 2016) ("In cases that involve suspects making confessions to friends, relatives, and other associates, the law need not be concerned with whether that confidant could properly be labeled as a private citizen or an agent of the State." (quoting *State v. Sanders*, 452 S.W.3d 300, 311 (Tenn. 2014)); *see also State v. Clark*, 452 S.W.3d 268 (Tenn. 2014). The issue of the confidant's agency only arises when the defendant's Sixth Amendment right to counsel is at stake, *Massiah v. United States*, 377 U.S. 201 (1964) and the right to counsel only attaches when formal charges are initiated, *Willis*, 496 S.W.3d at 703.

sufficient and that any error was harmless but concedes that the convictions in Counts 3, 5, and 7 violate the principles of double jeopardy and should be merged into Counts 2, 4, and 6 respectively.

When the evidence adduced at trial indicates that the defendant has committed more offenses against the victim than were charged in the indictment, the State must elect the facts upon which it intends to rely for each count of the indictment in order to protect "the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." *State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001); *see also State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). The election requirement arises most often when a defendant is alleged to have performed multiple sexual acts over a lengthy period of time against young children who are unable to provide the exact date on which any one act occurred. *See, e.g.*, *Johnson*, 53 S.W.3d at 631; *Brown*, 992 S.W.2d at 391-92. Our supreme court has held that when an "indictment charges that sex crimes occurred over a span of time, evidence of unlawful sexual contact between the defendant and the victim allegedly occurring during the time charged in the indictment is admissible," but the State "must elect at the close of its case-in-chief the particular offense for which it is seeking a conviction" in order "to preserve a criminal defendant's right under the state constitution to a unanimous jury verdict" while allowing "latitude in the prosecution of criminal acts committed against young children who are frequently unable to identify a specific date on which a particular offense was committed." *State v. Knowles*, 470 S.W.3d 416, 423-24 (Tenn. 2015) (citations omitted). "Any description that will identify the prosecuted offense for the jury is sufficient. In fulfilling its obligation . . . to ensure that an election occurs, the trial court should bear in mind that the purpose of election is to ensure that each juror is considering the same occurrence." *State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993) (internal citations and footnote omitted).

Our supreme court grants the State "some latitude in the prosecution of criminal acts committed against young children who are frequently unable to identify a specific date on which a particular offense was committed." *State v. Qualls*, 482 S.W.3d 1, 10 (Tenn. 2016) (quoting *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994)). "The election requirement may be satisfied in a variety of ways," including by having the victim identify incidents by "a specific month," type of abuse, or "reference to a meaningful event in his or her life." *Id.* at 10-11.

When the State is faced with the "unusual situation" of a victim's being able to provide only "generic evidence" of "a pattern of abuse that occurred over an extended period of time," the State may rely on a modified unanimity jury instruction "as a substitute

for the strict election doctrine."[3] *Id.* at 14-15. However, the reliance upon a modified unanimity instruction is "limit[ed] . . . to cases involving *only* generic evidence." *Id.* at 16 (emphasis added). When the State "presents non-generic evidence of distinguishable criminal acts, the prosecution must elect the specific act for which it seeks conviction in a manner that identifies the prosecuted offense for the jury." *Id.* Importantly, when an election of offenses is required, "[t]he election must be made at the conclusion of the State's case-in-chief." *Id.* at 10 (citing *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994)); *Knowles*, 470 S.W.3d at 423-24.

Here, with the exception of Counts 8, 9, and 10, the State presented non-generic evidence of criminal acts and, consequently, was required to make an election at the close of its case-in-chief. The trial court discussed the State's elections at the end of the State's case-in-chief, but other than assuring the court that it could make sufficient elections as to each count, the State did not make explicit elections until its closing arguments.

The defendant did not object to the State's election of offenses at trial and did not raise the issue in his motion for new trial. Consequently, our review is limited to plain error review. Tenn. R. App. P. 36(b); *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010).

"Because the election requirement safeguards a criminal defendant's fundamental, constitutional right to a unanimous jury verdict, errors pertaining to the

---

[3] The Tennessee Pattern Jury Instructions provides the following modified unanimity instruction developed from the language in *Qualls*:

> The state has offered proof in its case in chief of more than one act allegedly committed *[by the defendant][by one for whom the state alleges the defendant is criminally responsible]* which the state alleges constitutes an element of the offense of _____ as charged in Count _____ of the indictment. To ensure a unanimous verdict, the State must prove beyond a reasonable doubt the commission of all of the acts described by the alleged victim *[in that particular count]* as occurring within the time period charged in *[that count of]* the indictment.
>
> Before you can find the defendant guilty, you must unanimously agree that the State has proven beyond a reasonable doubt the commission of all of the acts described by the alleged victim as occurring within the time period charged in *[that count of]* the indictment.

7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.25(a).

sufficiency of the prosecution's election are subject to plain error review." *Knowles*, 470 S.W.3d at 424 (citing *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973); *Kendrick*, 38 S.W.3d at 567; *Walton*, 958 S.W.2d at 726-27 (Tenn. 1997); *State v. Clabo*, 905 S.W.2d 197, 204 (Tenn. Crim. App. 1995)). "When applying plain error review," we are mindful "that the election requirement is merely a means by which to protect the right to a unanimous verdict. There is no right to a perfect election, and . . . the election requirement may be satisfied in a variety of ways." *Knowles*, 470 S.W.3d at 424. Importantly, "the election requirement applies to offenses, not to the facts supporting each element of the offense." *Id.*

Here, the record clearly establishes what occurred in the trial court. Furthermore, we can think of no tactical reason for the defendant to waive the State's obligation to elect offenses. We conclude that substantial justice is at stake in this case and will address whether the State's elections were sufficient to protect the defendant's constitutional rights as to each charged count.

*Count 1 - Aggravated Sexual Battery*

As to Count 1, the presentment charged the offense of aggravated sexual battery of a child less than 13 years old by touching the victim's "primary genital area" "on or between" June 19, 2013 and June 18, 2016. The State elected the specific act of the defendant's touching the victim's vagina over her clothing in the living room. The trial court charged the jury that to find the defendant guilty of Count 1, they must consider only whether when the victim "was approximately nine, ten, eleven, or twelve years old," the defendant "touched [her] vagina with his hand on top of her clothes in the living room."

In the State's questioning the victim whether the defendant had ever touched the victim's vagina over her clothing, the following exchange occurred:

Q: Okay. Did that happen in your bedroom or some other room in the house?

A: The—the living room. Sorry.

Q: Okay. So there was a time that you were in the living room with [the defendant]?

A: It would have—I mean, it was . . .

Q: I'm just asking to try to understand. You've talked about

-11-

the incident that he touched you on your butt, the first incident.

A: Uh-huh.

Q: Was there a second incident you're talking about now where he also touched your vagina in the living room over your clothes?

A: No. I was saying in general it would just be anywhere. Like, out of those rooms I would [indiscernible].

[Q]: I'm sorry. I'm—I don't think I'm understanding.

[A]: I'm trying to think of a way to put this to make sense of it.

. . . .

A: Okay. I just said *"living room"* to give him, like . . . Like, it would have happened anywhere. Like, out of the rooms I had already described to you, it happened in all of them.

. . . .

Q: Okay. And the touching I'm specifically asking about now is—is only an instance where he would have touched you on your vagina over your clothes.

Do you have a specific memory of that happening and where that would have happened at?

A: No.

It is clear from this exchange that the victim clarified that there was not a specific incident of touching over her clothes that occurred in the living room and that she did not recall any specific incident. The evidence did not support the State's election for the aggravated sexual battery charge in Count 1 because the victim could not recall any specific incident. Our supreme court has provided an avenue for the State to pursue convictions of sexual offenses on generic evidence, *see Qualls*, 482 S.W.3d at 17 ("[T]he election doctrine may be satisfied in generic evidence cases by the trial court providing a

modified unanimity instruction that allows a conviction only if the jury unanimously agrees the defendant committed all the acts described by the victim."), but here the State chose to pursue a conviction by electing a specific incident and did not ask the trial court for a modified unanimity instruction as required by *Qualls*. Because the victim testified only that the defendant generally touched her vagina over her clothing on multiple occasions, the jury could not have rendered a unanimous verdict as to a specific instance of conduct. Consequently, the evidence did not support the State's election, and the election was insufficient to protect the defendant's right to a unanimous jury. Because, as we will discuss below, the evidence was insufficient to support the conviction in Count 1, that count is reversed, and the underlying charge is dismissed.

*Counts 2 and 3 - Rape of a Child and Incest*

As to Count 2, the presentment charged rape of a child by vaginal penetration of a child less than 13 years old occurring between June 19, 2013 and June 18, 2016. Count 3 charged incest related to the same conduct charged in Count 2. The State elected the specific conduct of the defendant's digital penetration of the victim in bedroom 1 in 2013. The trial court instructed the jury that to find the defendant guilty of Count 2, they must consider only whether when the victim "was approximately nine to ten years old during 2013[,] the same year [the defendant] came to reside within the residence," the defendant "put his hand inside of [the victim's] pants and then put his finger inside her vagina" while the victim was in bedroom 1. The victim's testimony established that she lived in bedroom 1 when the defendant moved into the house in 2013 and that she moved into bedroom 2 sometime in 2015. The victim could differentiate specific acts of digital penetration only by location—one incident in bedroom 1 and another incident in bedroom 2. The victim could not provide more specific details as to when the incident of digital penetration in bedroom 1 occurred. The State's electing that the offense occurred in bedroom 1 is sufficient to guarantee jury unanimity and protect the defendant from double jeopardy in Counts 2 and 3.

*Counts 4 and 5 - Rape of a Child and Incest*

As to Count 4, the presentment charged rape of a child by digital penetration of a child less than 13 years old, occurring between June 19, 2013 and June 18, 2016. Count 5 charged incest related to the same conduct charged in Count 4. The State elected the defendant's digital penetration of the victim in 2015 in bedroom 2. The trial court instructed the jury that to find the defendant guilty on Count 4, they must consider only whether when the victim "was approximately twelve years old during 2015," the defendant "came into her bedroom, . . . and he put his hand inside of [her] pants and then put his finger inside of her vagina" while the victim slept in a bunk bed in bedroom 2. The victim's

-13-

testimony established that she moved into bedroom 2 sometime in 2015 and that the defendant digitally penetrated her vagina at some point while she lived in bedroom 2. The victim could not otherwise provide more specific details as to when the incident of digital penetration in bedroom 2 occurred. The State's electing an instance of digital penetration in bedroom 2 is sufficient to differentiate from the incident that occurred in bedroom 1 as charged in Count 2 and was sufficient to protect the defendant's right to jury unanimity and against double jeopardy violations in Counts 4 and 5. The fact that the victim could not identify a specific time when the digital penetration occurred does not invalidate the State's election.

*Counts 6 and 7 - Rape and Incest*

As to Count 6, the presentment charged rape by vaginal penetration by force or coercion, occurring between June 19, 2016 and June 18, 2018. Count 7 charged incest related to the same conduct charged in Count 6. For Count 6, the State elected the single act of penile penetration that occurred in bedroom 3. The trial court instructed the jury that to find the defendant guilty of Count 6, they must consider only whether when the victim "was approximately thirteen, fourteen, or fifteen years old," the defendant "came into the bedroom [3] wearing only his boxers and was holding a beer. [The defendant] instructed [the victim] to lay on her stomach and removed her clothes. [The defendant] then inserted his penis into [the victim's] vagina." This election was sufficient to protect the defendant's right to a unanimous jury verdict as to Counts 6 and 7.

*Counts 8 and 9 - Rape and Incest*

For Count 8, the presentment charged rape by digital penetration by force or coercion, occurring between June 19, 2016 and June 18, 2018. For this count, the State elected the "digital penetrations . . . [that] happened on a nightly basis until [the defendant] moved out. [The defendant] continues coming into [the victim's] bedroom [2] during . . . those ages, 14, 13, and he's still coming into that bedroom, still sticking his finger inside of her." The trial court instructed the jury that to find the defendant guilty on Count 8, they must consider only whether when the victim "was thirteen or fourteen years old," the defendant "continued to penetrate her vagina with his finger on an almost nightly basis until he left the family home in 2018." In our view, this election was insufficient to protect the defendant from double jeopardy; although the State elected the victim's age as 13 or 14 years old, the victim testified to only one specific act of digital penetration occurring in bedroom 2, and the jury could have considered the same evidence supporting the conviction in Count 4. Moreover, the generic evidence of almost-nightly digital penetrations is insufficient to protect the defendant's right to a unanimous jury verdict, and the State did not request the modified unanimity instruction under *Qualls*. Consequently,

-14-

the election was also insufficient as to Count 9.[4] The defendant is entitled to a new trial on Counts 8 and 9.

*Count 10 - Sexual Battery by an Authority Figure*

As to Count 10, the presentment charged sexual battery by an authority figure of a child 13 or older but less than 18 by touching the victim's "primary genital area" between June 19, 2016 and June 18, 2018. For this count, the State made the following election:

> [T]ake the year 2015.[5] That's the last year that he's in the home that's distinct from any previous count we've asked you to look at. [The victim] told you [the defendant] continues to come into the bedroom, continues to touch her vagina. . . . [The defendant is] married to [the victim's] mother. He's a stepparent . . . [with] the right to discipline."

The trial court instructed the jury that to find the defendant guilty on Count 10, they must consider whether when the victim "was approximately 15 years old," the defendant "continued to penetrate her vagina with his finger on an almost nightly basis until he left the family home in 2018" and whether the defendant was the victim's "stepparent and had parental authority over [her] at the time." Again, we find this election insufficient to protect the defendant against double jeopardy and to ensure a unanimous jury verdict. Because the victim could not differentiate specific instances of digital penetration other than by the two bedrooms, the jury could have considered the same evidence that supported the conviction in Count 4, and the generic evidence that the digital penetration occurred on an almost-nightly basis is not sufficient to ensure jury unanimity as required by our constitution. The defendant is entitled to a new trial on Count 10.

Although we have concluded that the defendant is entitled to a new trial on Counts 1, 8, 9, and 10, we will consider the sufficiency of the evidence as to all counts to facilitate further appellate review.

---

[4] The election for Count 9 may be inconsistent with the presentment. The presentment alleges that the act in Count 9 occurred "on or about June 19, 2016." Unlike every other count of the presentment, Count 9 does not allege a range of time, but is essentially time specific. *See McCullough v. State*, No. M2004-02430-CCA-R3-PC, 2006 WL 1896362, at *6 n.2 (Tenn. Crim. App. July 7, 2006) ("[T]he petitioner's indicment was essentially time specific, alleging that the offense was committed on or about July 28, 1998."). The State's election, however, offers a range from 2016 to 2018. In essence, it expands the time span set forth in the presentment.

[5] It appears that the State misspoke and meant to say 2018, which was the year the defendant moved out of the victim's home. This error, however, further convolutes the State's attempted election.

### III.  Sufficiency of the Evidence

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).  This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact.  *Dorantes*, 331 S.W.3d at 379.  The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence.  *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).  Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.  *Id.*

### A.  Aggravated Sexual Battery

As charged in Count 1, aggravated sexual battery is "unlawful sexual contact with a victim by the defendant or the defendant by a victim" when "[t]he victim is less than thirteen (13) years of age."  T.C.A. § 39-13-504(a)(4).  "'Sexual contact' includes the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification . . . ."  *Id.* § 39-13-501(6).  "'Intimate parts' includes the primary genital area . . . of a human being . . . ."  *Id.* § 39-13-501(2) (2010).[6]

The evidence considered in the light most favorable to the State does not really establish an offense.  The victim could not recall any specific instance, but said that the offense occurred when she was "both" younger and older than 13 and "in all of the[]" rooms in the house.  We conclude that this evidence is not sufficient to support the defendant's conviction for aggravated sexual battery in Count 1.  That conviction is reversed, and the underlying charge is dismissed.

### B.  Rape of a Child and Related Assault Convictions

As charged in Counts 2 and 4, "[r]ape of a child is the unlawful sexual

---

[6]   The definition of "intimate parts" was expanded in July 2013, but the additional terminology is not relevant here.  At all times relevant to this case, the definition included "the primary genital area" as charged by the State.  *See* T.C.A. § 39-13-501(2) (Supp. 2013).

penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." *Id.* § 39-13-522(a) (2010). Our Code defines "sexual penetration" as "sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body." *Id.* § 39-13-501(8).

As relevant to the defendant's convictions of the lesser included offenses of assault in Counts 3 and 5, "[a] person commits assault who . . . [i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." *Id.* § 39-13-101(a)(3) (2010).[7]

The evidence considered in the light most favorable to the State established that in 2013, when the victim was 9 or 10 years old, the defendant came into bedroom 1 where the victim was in bed and touched her inside her vagina with his hand. This evidence sufficiently supports the defendant's conviction of child rape as charged in Count 2. This evidence also sufficiently supports the conviction of assault as charged in Counts 3 and 5. As we discuss below, Count 3 must merge into Count 2, and Count 5 must merge into Count 4.

### C. Rape and Related Assault and Incest Convictions

As charged in Counts 6 and 8, "[r]ape is unlawful sexual penetration of a victim by the defendant or of the defendant by a victim" and "[f]orce or coercion is used to accomplish the act." T.C.A. § 39-13-503(a)(1). As charged in Count 9, "[a] person commits incest who engages in sexual penetration as defined in § 39-13-501, with a person, knowing the person to be, without regard to legitimacy . . . [t]he person's . . . stepchild." *Id.* § 39-15-302(a)(1). Our Code defines "sexual penetration" as "sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body." *Id.* § 39-13-501(8).

As relevant to the defendant's conviction of the lesser included offense of assault in Count 7, "[a] person commits assault who . . . [i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." *Id.* § 39-13-101(a)(3) (2010).

Taken in the light most favorable to the State, the evidence established that in 2016, the defendant had the victim go to bedroom 3 and while she was in bed trying to

---

[7] The assault statute was amended several times during the span of dates at issue in this case; however, the relevant subsection did not change. *See* T.C.A. § 39-13-101(a)(3) (2010), (Supp. 2013), (Supp. 2016), (Supp. 2017).

sleep, he entered the room wearing only his boxers and put his penis in the victim's vagina. This evidence is sufficient to support the defendant's convictions in Counts 6 and 7. On another occasion, in 2015 or later, the defendant came into bedroom 2 where the victim was sleeping and placed his finger inside her vagina. The evidence also showed that the defendant married the victim's mother in 2017, becoming the victim's stepfather. This evidence sufficiently supports the defendant's convictions of rape in Count 8 and incest in Count 9.

### D. Sexual Battery by an Authority Figure

As charged in Count 10, "[s]exual battery by an authority figure is unlawful sexual contact with a victim by the defendant" when "[t]he victim was, at the time of the offense, thirteen (13) years of age or older but less than eighteen (18) years of age" and "[t]he defendant had, at the time of the offense, parental . . . authority over the victim and used the authority to accomplish the sexual contact." T.C.A. § 39-13-527(a)(1), (3)(B). "'Sexual contact' includes the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification . . . ." Id. § 39-13-501(6). "'Intimate parts' includes the primary genital area . . . of a human being . . . ." Id. § 39-13-501(2) (2010).

The evidence, taken in the light most favorable to the State, showed that the defendant moved into the victim's home in 2013 and had authority to instruct and discipline the victim and her siblings. While living in the home, the defendant entered the victim's bedroom on an almost nightly basis until he moved out in late 2018 or early 2019, and inserted a finger into her vagina. This evidence is sufficient to support a conviction for sexual battery by an authority figure.

### III. Merger

Another issue not raised by the parties but subject to plain error review is whether the defendant's convictions for assault by extremely offensive or provocative contact as lesser included offenses of incest in Counts 3, 5, and 7 and the relative convictions of rape of a child in Counts 2 and 4 and rape in Count 6 violate the principles of double jeopardy. In supplemental briefing, the defendant argues, and the State concedes, that the convictions violate the principles of double jeopardy. The defendant contends, however, that the assault convictions should be dismissed, and the State argues that the assault convictions should merge into the related convictions of rape of a child and rape.

We need not tarry long over whether the defendant's dual convictions in

-18-

Counts 2 and 3, Counts 4 and 5, and Counts 6 and 7 violate the principles of double jeopardy. The State concedes that they do, and it is well-established that assault by extremely offensive or provocative contact is a lesser-included offense of rape of a child, *State v. Elkins*, 83 S.W.3d 706, 711 (Tenn. 2002), and rape by force or coercion or without consent, *State v. Prentis Lee*, No. W2015-01538-CCA-R3-CD, 2016 WL 6915582, at *25 (Tenn. Crim. App., Jackson, Nov. 23, 2016) (citations omitted). Here, the defendant's convictions for assault by extremely offensive or provocative contact in Counts 3, 5, and 7 arise from the same conduct giving rise to the convictions in Counts 2, 4, and 6 respectively. The proper remedy for dual convictions of which one is a lesser included offense of the other is merger rather than dismissal of the lesser offense. *See State v. Davidson*, 509 S.W.3d 156, 217 (Tenn. 2016) ("Merger is required when a jury returns guilty verdicts on two offenses, one of which is a lesser-included offense of the other." (citation omitted)). Consequently, the defendant's conviction in Count 3 must merge into Count 2, Count 5 must merge into Count 4, and Count 7 must merge into Count 6. We remand the case to the trial court for entry of corrected judgments in Counts 3, 5, and 7 reflecting the proper merger of convictions.

## IV. Other Errors

We also note clerical errors in the judgments for the defendant's assault convictions in Counts 3, 5, and 7. This court "may at any time correct clerical mistakes in judgments . . . arising from oversight or omission." Tenn. R. Crim. P. 36. The defendant was convicted of assault by physical contact that "a reasonable person would regard . . . as extremely offensive or provocative," T.C.A. § 39-13-101(a)(3), which is designated as a Class B misdemeanor, *id.* § 39-13-101(b)(1)(C). The judgments for these convictions misidentify the conviction as being assault by threat of bodily injury, which is a Class A misdemeanor. *Id.* § 39-13-101(a)(2), -101(b)(1)(B). Not only do the judgments reflect the incorrect subsection of the assault statute as the basis of the conviction, but the trial court erred by imposing a sentence reserved for Class A misdemeanors. *See id.* § 40-35-111(e)(1). Because the trial court imposed the maximum sentence available for a Class A misdemeanor, we modify the sentences for Counts 3, 5, and 7 to six months' incarceration, the maximum sentence allowed for a Class B misdemeanor. *See id.* § 40-35-111(e)(2).

Accordingly, the judgment of conviction in Count 1 is reversed, and the underlying charge in that count is dismissed. The judgments of the trial court as to the convictions in Counts 2, 3, 4, 5, 6, and 7 are affirmed, the defendant's convictions in Counts 8, 9, and 10 are vacated and remanded for a new trial, and the case is remanded for entry of corrected judgments reflecting the proper assault convictions and sentences and merger in Counts 3, 5, and 7.

_____
JAMES CURWOOD WITT, JR., JUDGE